ODOM, Justice.
 

 The Robinson-Slagle Lumber Company, Inc., through its receivers, brought suit against the defendant for $4,732.87. The petition is brief and reads as follows:
 

 “That A. P. Peyton, a resident of Caddo Parish Louisiana, is justly and legally indebted unto your petitioner in the full sum of Four Thousand Seven Hundred Thirty-two & 87/100 Dollars ($4,732.87) with legal interest for merchandise furnished and cash advanced by the Robinson-Slagle Lumber Co., Inc., to said A. P. Peyton, and charged to his account as shown by the itemized account, hereto annexed and made part hereof.”
 

 It is alleged that the indebtedness is long past due and the prayer is for judgment in the amount stated.
 

 A.n exception of vagueness and a motion for particulars was filed, the basis of which was, as stated in the motion, that “the petition fails to state the terms and conditions under which the merchandise was allegedly furnished, and in this respect it does not state whether there was a contract upon the' subject, and if so, the terms thereof, including the terms and conditions under which the same was to be paid for.”
 

 Plaintiff was ordered to particularize and did so as follows:
 

 “That all of the aforesaid goods, wares and merchandise were charged to the said A. P. Peyton, at the fair and' ordinary prices then prevailing for such articles; and that the cash advances to H. L. Davis and H. C. Winberry, shown on the account hereto annexed and made part hereof were made by the Robinson-Slagle Lumber Company, Inc., at the request and on the instruction of A. P. Peyton, being all or a portion of the amounts due the aforesaid Davis and Winberry for work done on property owned by A. P. Peyton, which property your petitioners are informed is located at No. 420 Forest Street, City of Shreveport.
 

 
 *361
 
 “That all of the allegations made by petitioners are based upon information given to them by the employees of the RobinsonSlagle Lumber Company, Inc., and are made, therefore, expressly upon information and belief.”
 

 Annexed to the petition is an itemized account covering twenty-six typewritten pages showing that on sundry dates between October 9, 1928, and August 28, 1931, the defendant was charged on the books of the plaintiff company with items of lumber and other building material, and with cash advanced to H. L. Davis and H. C. Winberry, amounting to the net amount of $4,732.87 sued for.
 

 Defendant filed an exception of no cause of action, which was overruled. He then pleaded prescription of one and three years, which pleas were finally referred to the merits.
 

 Defendant answered, admitting .that he had received the lumber and other building material shown by the account, but especially denied that he was indebted unto plaintiff in any sum whatever for reasons set' out at great length.
 

 The case was tried by jury and there was verdict for defendant. Whether the finding of the jury was based upon defendant’s plea that the debt, if any had ever existed, was prescribed, or on the merits, does not appear. The verdict of the-jury was approved by the trial judge and there was judgment rejecting plaintiff’s demands, It appealed.
 

 Counsel for defendant earnestly contend that their pleas of prescription were well founded and should have been sustained. Perhaps so. But we find it unnecessary to pass on them because we find that the case is with defendant on the merits. -
 

 The facts are not disputed, but, as counsel for plaintiff say in their brief, “there is much difference between thé parties as to the deductions to be drawn and the conclusions which must follow from the established facts.”
 

 The Robinson-Slagle Lumber Company, Inc., is a Louisiana corporation engaged, in the business of selling lumber and other building material in Shreveport. W. A. Robinson, who lived in Shreveport, was its president and general manager. In September, 1927, Robinson and W. W. Campbell purchased from A. C. McClelland and E. C. Montgomery fifteen building lots in the “Manchester subdivision” near Shreveport for $6,000. The price was represented by one note for said amount secured by mortgage on the lots. The defendant, A. P. Peyton, acquired the note in due course. It was finally paid in full and Peyton surrendered it to Robinson.
 

 The testimony shows, in fact Peyton admits, that he received the lumber and other material shown on the account attached to plaintiff’s petition and that the amount of the account, which is $4,732.87, .was credited as a payment on the note. He further admits that this lumber and
 
 *363
 
 other material was taken from a general stock which belonged to the corporation, and that the material was delivered to him and the price credited on the note, all in accordance with an agreement entered into by him with Robinson.
 

 Plaintiff’s contention therefore is that the note which Peyton held was the personal obligation of Robinson and that Peyton knew when he received the material and credited its price on the note that Robinson was paying his private debt with property which belonged to the corporation, of which he was president and general manager, and that Peyton, knowing that the material which he received belonged to the corporation, is indebted to the corporation for its value.
 

 Counsel for plaintiff cite numerous cases holding in effect that an agreement between a president and general manager of a corporation and his personal creditor by which the debtor agrees to deliver to his creditor the funds or goods of the corporation in payment of his personal debt is an illegal diversion of corporate property into the hands of the officer’s creditor, the effect of which is to render the creditor of the officer liable to the corporation for the value of the goods thus obtained.
 

 Among the cases cited are Edenborn v. Blacksher, 137 La. 894, 69 So. 737, and Wallace v. Mouton, 170 La. 47, 127 So. 360.
 

 Among the cases cited is Fehr v. Campbell, decided by the Supreme Court of Pennsylvania, reported in 288 Pa. 549, 137 A. 113, 52 A. L. R. 506, holding that “an officer of a corporation is presumed to have no authority to use its funds or securities to pay his private obligations or as collateral for his personal loans.” Another is Federal Mortgage Co. v. Simes, a Wisconsin case reported in 210 Wis. 139, 245 N. W. 169, holding that “one receives securities of corporation from officer thereof in payment of latter’s personal debt at his peril.” Still another is Roc v. Lahaye (C. C. A.) 64 F.(2d) 962, holding that “secretary, treasurer, and general manager of corporation could act only within scope of his authority, express or implied, and in neither relationship would he have authority to pay his own debts with corporate funds.”
 

 The doctrine announced in these cases, and in many others which might be cited, would be applicable here if Robinson had used the property of the corporation to pay his personal debt. But we do not find that he did. Technically, the note was Robinson’s obligation because he signed it personally. But the testimony shows that the purchase of the lots by Robinson and the giving of the note were intended by him to be transactions for the corporation which he represented and not for himself personally, and, under the circumstances shown by the record, the corporation cannot now be heard to repudiate them.
 

 Robinson did not appear as a witness, but it was admitted by counsel for the re
 
 *365
 
 ceivers that, if present, he would testify that when he and Campbell purchased the lots and gave the note “it was in order to further the business of the Robinson-Slagle Lumber Co., Inc.; that at the time the said E. C. Montgomery and C. A. McClelland were large operators, using volumes of building material in the city of Shreveport and that the said W. A. Robinson in order to further the good will of the company with Montgomery and McClelland, purchased the property above described. The said Robinson would further testify that in relation to the note for $6,000.00 given by him and W. W. Campbell to E. C. Montgomery on Sept. 13, 1927, it was really the obligation of the Robinson-Slagle Lumber Co., Inc., for the reasons previously stated.”
 

 Robinson’s statement that this was intended to be a corporation transaction and not his personally is corroborated by the manner in which the transaction was handled later. Lumber and other material was delivered to Peyton, charged to him on the books of the corporation, and at intervals he, at Robinson’s suggestion, credited the amounts on the note. When the amount of the account equaled the balance due on the note, the note was marked paid in full and returned to Robinson, who then instructed the bookkeeper to “charge off” or close the Peyton account and to charge the amount thereof to the corporation’s “real estate account.”
 

 The note matured on September 10, 1928, and Peyton demanded payment. On October 15, 1928, the parties executed a written instrument which recites that W. A. Robinson had paid the interest on the note to September 10, 1928, and further that W. A. Robinson “has paid to the party of the first part (Peyton) the sum of one thousand & no/100 ($1,000.00) Dollars, represented by credit memorandum of the Robinson, Slagle Lumber Co., Inc., for one thousand ($1,000.00) Dollars worth of lumber and building material, which the said W. A. Robinson obligates himself to deliver to the party of the first part as, if arid when demanded and which one thousand ($1,000.00) shall be credited on the reduction of the principal of the above described note.”
 

 This instrument was found by the receivers in the files of the corporation and is offered in evidence to show that the Peyton note was paid, at least in part, by property belonging to the corporation, which is not denied. This payment of $1,000 on the note with property belonging to the corporation is consistent with Robinson’s statement that the transaction was for the corporation rather than for him personally, and in view of the circumstances which we shall state later in this opinion, we think he was sincere in his statement and that he was prompted by sincere motives.
 

 Peyton, the defendant, testified that he never at any time doubted Robinson’s au
 
 *367
 
 thority to make and carry out this transaction ; that he believed that Robinson was virtually the corporation. Such belief was well founded, because he knew, as others did, that Robinson had on other occasions purchased real estate for the corporation, taking title in his own name, and subsequently transferred it to the corporation with the approval of the board of directors. Peyton’s perfect good faith is attested by counsel for plaintiff, who say in their brief at page 41:
 

 v “Briefly summarized, his testimony is that he knew that Robinson often bought property for the corporation in his own name and was given the greatest latitude of. discretion as its general manager; that he relied on the fact that Robinson had complete charge of the business, made no investigation of the corporate records or affairs, did not know how or from what source Robinson obtained his authority and did not know whether or not the goods he obtained were being charged to him or to Robinson or how the ‘matter was being handled. A reading of the defendant’s own testimony in this case marks deeply the impression that he had the same confidence in Robinson that the directors of the Lumber Company had and that he relied upon Robinson to protect his interest, just as the directors of the Lumber Company looked to Robinson to act honestly and faithfully for the corporation in all matters affecting its interest.”
 

 The testimony shows unmistakably that the board of directors turned over to Robinson the entire conduct of the affairs of the corporation. He was permitted to do as he pleased in matters pertaining to the business of the corporation. He was not only the president, but the general manager, and, as such, had entire charge. On several occasions, he purchased valuable real estate for the corporation and took title in his own name, supplied lumber and other material belonging to the corporation for building houses thereon, all apparently without the knowledge of the board of directors. But later, when they were informed of such transactions, they adopted resolutions approving his dealings and authorizing the corporation to accept title to such real estate from him. A member of the board of directors testified that he could not recall a single instance where the board had‘failed to ratify Robinson’s dealings for the corporation. This director was asked if Robinson “signed all papers for the board of directors,” and he said, “As far as I know, he always did. We had implicit confidence in him and that is the reason we left everything up to him.”
 

 The members of the board were not residents of Shreveport and it was known generally that Robinson was in full charge of the corporation’s affairs there. His reputation for honesty and his power and authority to deal as he pleased for the cor
 
 *369
 
 poration were never questioned, and, as already stated, not one of his acts was ever repudiated by the board of directors. He had,on numerous occasions paid his private debts with corporate funds, but always charged such sums as he drew to his account. Ordinarily, his account with the company was heavily overdrawn. An audit of the books in the latter part of 1928 showed that his account with the corporation was overdrawn $4,400. At the end of 1929, his overdraft was $12,372.79; in March, 1930, it was $10,665.10, and at the end of 1930 it was $18,708.19. Employees were permitted by Robinson to overdraw also. An audit made in December, 1930, showed overdrafts by Robinson and employees of the corporation totaling $40,-683.30.
 

 At a meeting of the board of directors held on April 8, 1930, a resolution was adopted disapproving this practice. The minutes recite that the report of the auditors made April 1st (1930) showed these overdrafts, “which is the first time this condition had come to the attention of this board of directors due to their never having had a copy of the detailed accounts receivable.”
 

 This shows the extent to which the board had surrendered control and management of the corporate affairs to Robinson, its president and general manager. As to the authority he was permitted to exercise, counsel for plaintiff in their brief at page 43 say:
 

 “Of course, Robinson had charge of the corporation’s affairs, hired and fired employees, borrowed and paid money, drew checks or authorized them to be drawn, extended or refused credit, made contracts, bought property, and in some instances took title in his own name, subsequent ratification being obtained from the board of directors; in other words, he was the president, the general manager and the chief executive officer of the corporation and functioned accordingly.”
 

 Robinson says he made this particular contract for the corporation and in furtherance of its business and we think he did. While he had no express authority to make it, he had implied authority. There was never any express limitation of his powers, and in this transaction he seems to have followed his usual course of dealing for the corporation, all prior similar transactions having been approved.
 

 Under the circumstances here shown, the corporation cannot now be heard to say that Peyton, the defendant, should have investigated to see whether Robinson had express authority to deal for the corporation as he did in this case. .Robinson was not only president of the corporation, but was expressly elected by the board of directors to be its general manager, and his powers, as such, were never expressly limited. He was not a mere agent of the corporation, but its general manager, and in his dealings with the public, with the
 
 *371
 
 sanction of the hoard of directors, he had in effect become the corporation itself.
 

 “It is now well settled that when, in the usual course of business of a corporation, an officer has been allowed to manage its affairs, his authority to represent the corporation may be implied from the manner in which he has been permitted by the directors to transact its business. This is only the application of the principle that usual employment is evidence of the powers of an agent and the principal is held responsible for the acts of his agent within the apparent authority conferred on the agent.” 7 R. C. L. 623. See, also, Fletcher on Corporations, § 2098; Corpus Juris, vol. 14A, pp. 423, 424, § 2275; City Savings Bank & Trust Co. v. Shreveport Brick Co., 172 La. 471, 134 So. 397; Uline Loan Co. v. Standard Oil Co., 45 S. D. 81, 185 N. W. 1012, 27 A. L. R. 585.
 

 Even with the unlimited powers which Robinson had been permitted to exercise in his dealings for the corporation, he could not, of course, use the property of the corporation to pay his private debts, and if he had done so in this case, to the knowledge of Peyton, Peyton would be liable. What we hold is that this was intended to be a transaction for the corporation, which it cannot now, under the circumstances, repudiate.
 

 The judgment is affirmed.