109 So.2d 447

Gus FRIEDMAN et al.

v.

NOEL ESTATE, INC.

No. 43730.

Feb. 16, 1959.

Rehearing Denied March 23, 1959.

Bullock & Bullock, Shreveport, for defendant-appellant.

Booth, Lockard, Jack, Pleasant & LeSage; Wilson, Abramson & Maroun, Shreveport, for plaintiffs-appellees.

FOURNET, Chief Justice.

This suit was instituted by Gus Friedman and Arthur Arnold, businessmen of

Shreveport, for a declaratory judgment decreeing that on June 5, 1956, the defendant, Noel Estate, Inc., through its President James S. Noel,[1] by verbal agreement leased to them certain adjoining parcels of land already occupied as their places of business,[2] fronting on the Greenwood Road on the outskirts of the city,[3] the allegations of the petition being that, under the terms of a written lease dated July 22, 1952, between these plaintiffs and the defendant, Friedman occupied a strip to the west of another

tenant (Simmons Drilling Company), Arnold occupied the land adjoining Friedman on the west, and a third parcel, immediately to the west of Arnold's premises and extending to the next tenant on the west, was leased to the plaintiffs jointly, the description of these areas in the lease being by boundaries only;[4] that although the lease was not to terminate until June 30, 1957, the plaintiffs, being anxious to have assurance of renewal because of the expense of moving, lack of available loca-

1. Noel Estate, Inc., is a corporation composed of four members of the Noel family; it is a holding company, the owner of vast lands and considerable city property, and is engaged only in leasing the property for oil development and to other tenants for occupancy.
2. Gus Friedman is in the salvage business and is a scrap dealer; Arthur Arnold is in the oil well supply business, dealing principally in oil field pipe and equipment.
3. Defendant's holdings include approximately fifteen acres of land in the western part of Shreveport, with a frontage (northern boundary) on Greenwood road of approximately 950 feet, and extending south some 700 feet more or less to the Illinois Central Railroad right-of-way—this acreage being in the form roughly of a quadrangle.
4. According to the terms of the contract, the defendant leased to Gus Friedman "The following described portion of that tract of land in the J. L. Monkhouse Subdivision in Caddo Parish, Louisiana, in the SW/4 of SE/4, Section 9, Township 17, Range 14, known as Tract 35, City assessor's Plat No. 1776— Bounded on the East by the Western boundary of the tract leased by this Lessor to the Simmons Drilling Company and marked by a roadway running from the Greenwood Road South which

if extended would continue to the right-of-way of the Illinois Central Railway for an Eastern boundary; for a Southern boundary the Illinois Central right-of-way; for a Northern boundary the Greenwood Road; for a Western boundary a line perpendicular to the Greenwood Road extending to the right-of-way above mentioned North to the Greenwood Road and located at a point five (5) feet east of the galvanized building located on the above tract No. 35 and now occupied by Arthur Arnold, d/b/a Arnold Pipe & Supply Company." The rental for this parcel was $50 per month.

By the terms of the said lease, Arthur Arnold acquired from defendant that portion of the above tract No. 35 described as follows: "For an Eastern boundary line the Western boundary line of the tract above described and leased to Gus Friedman; for a Northern boundary the Greenwood Road; for a Southern boundary the Illinois Central Railroad right-of-way; for a Western boundary a line drawn from the Greenwood Road due South to the right-of-way above mentioned and beginning at a point on the Greenwood Road at which the present concrete sidewalk North of the leased premises terminates in concrete at its Western terminus, at which point there is an iron stake." The rental for this area was likewise $50 per month.

tions (particularly for a scrap yard), and a then-existing possibility of being required by ordinance to fence their respective areas —an impracticable outlay for a short period—began more than a year before termination date to urge the defendant to renew their leases, and in response the defendant's president, James S. Noel, on June 5, 1956, appeared with a surveying instrument and measured, for each plaintiff, a strip having a frontage of 200 feet to either side of a cement marker on Greenwood Road located five feet from the east side of the office building of Arthur Arnold (in the extreme northeast corner of his land), the survey extending 200 feet to the east thereof (Friedman's plot) and 200 feet to the west (Arnold's plot), thence between

parallel lines to the railroad right-of-way, with recognition of the existing division line between the properties, and with the privilege, in the case of Friedman who had installed a special spur over the rear portion of the tract to his east, to use 100 feet of additional ground paralleling his switch track for convenience in loading and unloading freight cars; the said verbal lease to be for a term of five years commencing July 1, 1957, at a monthly rental of $100 per month ending June 30, 1962, with the option to extend said lease for four more years at a monthly rental of $115 per month or to meet the bona fide offer made by any other person at least 90 days before option time; that as further consideration, plaintiffs were to immediately give up and

---

The portion of tract No. 35 which was jointly acquired by plaintiffs was described thus: "For an Eastern boundary the Western boundary of the tract above leased to Arthur Arnold; for a Northern boundary the Greenwood Road; for a Southern boundary the right-of-way of the Illinois Central Railroad; for a Western boundary a line along the fence on the Eastern boundary of the Brock Hammett Lumber Yard extending due North and South respectively to the Greenwood Road and the right-of-way above mentioned." The rental was $60 per month.

The parties stipulated: "It is understood and agreed that the above properties are presently being used for a scrap and salvage business and for an oil field pipe and supply and equipment business and that in the event the operation of the above businesses shall be prohibited by law or ordinance from being maintained on the above premises then this lease shall terminate as of that date as to all

the parties hereto. However, it is understood and agreed that in the event the Lessees, Gus Friedman and Arthur Arnold, are prohibited by operation of law or ordinance from using the portion of the above described premises leased to them jointly and described above as adjoining the eastern boundary of the Brock-Hammett Lumber Company then and in that event this lease shall terminate as to that portion of the above premises leased to Gus Friedman and Arthur Arnold jointly at the option of the Lessees as of the time at which said prohibition takes effect but the rental price of the two tracts above described and leased to Gus Friedman and Arthur Arnold separately shall be increased to Sixty Five and No/100 ($65.00) Dollars per month for each and the Lessor hereby agrees not to lease or let the remaining portion for any business competitive to that engaged in by the said Gus Friedman and Arthur Arnold."

clear of their materials the portion of land leased to them jointly, and additionally Friedman was to clear off and immediately release to defendant all property not covered by his verbal contract; [4½] that on June 12, 1956, defendant, through its President, wrote each plaintiff a letter [5] confirming in all details their verbal agreement made

4½. The 1952 lease contained no exact dimensions; however, a map filed as an exhibit by plaintiff shows that, according to the boundaries recited in the lease, Friedman's frontage on Greenwood Road measured almost 260 feet, Arnold's, about 201 feet, and the joint tract frontage, 138 feet.

5. As shown by copies of those letters attached to the petition, that addressed to Arnold stated:

"On June 5, 1956 I marked off an area for your business operations as exactly as I could (which area the city is requiring you to fence). Using the cement needle (about five feet from your office building) as a point of beginning, which conforms to previous arrangements, I measured you off 200 feet of frontage on the Greenwood Road and set an iron pipe to mark it. Then running at right angles we placed an iron cable holder at the rear of the I. C. Railroad right-of-way line, and measured you 200 feet along that right-of-way to a marker denoting the west line of the Friedman Iron and Supply Company, and from that stake northward to a point of beginning. The area so defined and marked for fencing is to be yours exclusively.

"Now the present lease at $80.00 per month is to be in effect for one more year, whereupon our company agrees now to offer you a 5 year extension of that lease for $100.00 per month or to July 1962, and then with the option to extend for 4 more years (to July 1966) at $115.-00 per month or to meet a bona fide and competent offer made in writing at least 90 days before option time. But it is clearly understood by all parties that a basic consideration for this offer is in event of another road, street, or highway being put in at the rear of this property the lessee will shrink up into his frontage or withdraw from using a strip of land fronting on the new street for a distance of at least 200 feet. This proviso being made the other terms follow.

"In the immediate future will you clear off your iron piles from that area not included in this lease, which cooperation by you will be greatly appreciated."

The letter addressed to Friedman differed to fit the circumstances: "This letter refers to our marking off boundary lines on June 5, 1956 for your business operations. We understand the city is asking you to fence in the area and you have required of us a specified line, in keeping with your needs and the company's plans for the area.

"In your case we have started your line at the east base of the cement marker approximately 5 feet from the east side of Arthur Arnold's office building. We have provided you with 200 feet of frontage on the Greenwood Road and placed an iron stake there. Then we placed two stakes in the rear, along the right-of-way of the I. C. Railroad, which we showed you.

"As your special spur comes in over another portion of the tract, we will grant you easement rights on 75 feet of ground paralleling the switch track, so that loading the cars will be convenient to you.

"This area defined for fencing is to be yours exclusively, but we still recommend for your consideration the placing of your fence from a point joining the rears of yours and the Arnold Supply offices, which placement would permit a fine off-street parking area solely under your control.

"Your present lease at $80 per month is to be in effect for one more year, whereupon our company agrees then to offer you a five year extension of the lease for $100 per month * * *" etc.

on June 5, 1956, and thereupon plaintiffs removed their property from the joint tract, Friedman also removed his materials from the strip covered by the written lease lying to the east of his 200 feet—although each continued to pay the same rental as before;[6] that plaintiffs then spent money to remove their material and for certain listed permanent improvements, to the knowledge of defendant, and for the first time on January 31, 1957, they were informed by defendant, through its president, that the letter of June 12, 1956, was merely an offer which was being withdrawn, and their lease would therefore terminate as of June 30, 1957; in the alternative plaintiffs showed that if the letter of June 12th was in fact an offer, their acts in placing improvements on the properties constituted an acceptance; but if not, they still had the right to accept, and thereby judicially declared their acceptance; they prayed, by this suit instituted on May 2, 1957, for a declaratory judgment decreeing the rights and obligations of the parties.

The answer, in the form of a general denial, also denied that defendant executed or authorized the alleged verbal lease of June 5, 1956, denied any justification for

the construction placed by plaintiffs on the two letters addressed to them on June 12, 1956, admitted the alleged offer from the Atlantic & Pacific Tea Company to lease the property at a much higher rental upon termination of plaintiffs' written lease, and denied any legal basis for a controversy or the necessity for a declaratory judgment, with prayer for dismissal of plaintiffs' suit.

Following trial on the merits there was judgment for plaintiffs decreeing that, for a term of five years beginning July 1, 1957, to July 1, 1962, Friedman and Arnold had good and enforceable leases on the particular parcels described in the judgment (these being the two areas surveyed by Noel on June 4, 1956), at $100 per month, with the option to plaintiffs to extend for four more years, or to July 1, 1966, at $115 per month or to meet a bona fide and competent offer, made in writing, at least ninety days before option time, and subject to the further proviso that if another road, street or highway is put in at the rear of this property, "each lease will shrink from or withdraw from a strip of land fronting on the said new street, road or highway a depth of 200 feet across the rear."

Defendant-appellant, assigning as error the trial judge's holding that oral leases

---

(The remainder of this paragraph is identical with paragraph 2 of the letter to Arnold.)

"In the immediate future will you clear off your iron piles from the area not included in this lease—which cooperation by you will be greatly appreciated."

6. The rental paid by each lessee was $80—$50 for the tract leased individually to each, plus half of the rental of $60 for the joint tract.

were executed by the defendant which are valid and subsisting contracts and that the June 12, 1956, letters were not offers but were a confirmation of the terms of said leases, and the further holding that the Articles of Incorporation of defendant authorized its president to execute leases without authority of its board of directors, submit that Mr. Noel's reason for going to plaintiffs' places of business was solely to give the plaintiffs fence lines, as requested by them;[7] the concluding paragraph in the June 12th letters, concerning removal of plaintiffs' material from other areas covered by the written lease, is explained as having been induced by the thought that since the fence line had been provided, in the words of Mr. James Noel, "I didn't see any need of having iron outside the fence * *." As an alternative defense, defendant contends there was no corporate authority for the lease because if any be found (there being none in defendant's by-laws or the statutory corporation law) it must appear in Article VIII of the Charter, as amended,[8] yet those provisions give authority to the president to perform administrative acts only—which means, say counsel, to manage, control, and conserve the assets of the corporation, and does not include the execution of a lease of the corporation's commercial real estate, "which is a species of alienation."

Counsel for plaintiffs-appellants, after inviting attention to facts and circumstances developed during the course of the trial which are said to be unreconcilable with defendant's position that the letter of June 12th was an offer and not a confirmation of the contract already perfect and complete in itself, maintain the correctness of the trial judge's ruling; they also argue, alternatively, that acceptance of an offer can be by acts; invoke the rule of strict construction against the author of an ambiguous document (the defendant's president having composed the letters of June 12, 1956); and, to indicate the authority of Noel, as president, to act for the corporation, show that the president of defend-

---

7. It appears from the testimony that six or seven years before this suit, a city zoning ordinance was adopted barring junk yards from certain areas, but Friedman's place of business was allowed to remain because already established; possibly in connection therewith, about two years later the City sent circular letters to junk yards on the subject of fencing. Arnold's business was not a junk yard, and he did not consider the letter applied to him; Friedman's business, to which the letter did apply, was not fenced as a consequence and no explanation is given—but since the contents of the letter are not shown it is difficult to assess its importance; in any event, it appears that both the plaintiffs desired to erect fences because of costly loss of their property through theft.

8. "The President of this corporation shall have the power and authority to perform administrative acts only, and may not buy and sell, mortgage and hypothecate the property, personal and real, and the rights and credits of the said corporation, without the necessary approval and authorization of the Board of Directors"

ant corporation had always leased the properties to these plaintiffs (beginning in 1946 with Friedman, and in 1949 with Arnold), and submit that the defendant held James Noel out as having authority—pointing out that the power to lease does not have to be expressed or special (Article 2997, La.Civil Code).

■ The arguments made in this Court differ little if any from those made below, as revealed by the trial judge's carefully prepared Reasons. He found that the facts of the case as developed during the trial were substantially in agreement with plaintiffs' allegations, and in this he is amply supported by the record—for Noel's explanations of his actions are lame, and other circumstances lead to the inevitable conclusion that (as found by the judge a quo) the parties agreed, on June 5, 1956, on the amount of property that the new lease was to cover and the terms thereof, and that the letter of June 12th was a confirmation thereof. This was convincingly shown, said the judge, by the "bare actions of the parties;" for example, there was a survey of the property *to be* leased, not of that presently under lease; each plaintiff thereafter gathered his property

within the newly marked 200-foot strip, at a cost to Friedman of $1,200 and to Arnold of several hundred dollars; Friedman immediately built a $6,000 concrete building, erected a fence along his newly surveyed eastern boundary, and released the 58 feet between his truncated holdings and the Simmons Company; defendant entered upon the said released 58 foot area, had a large portion excavated and leveled, and disposed of the earth for use in a project then under way; Noel visited the premises on several occasions and saw the changes made by Friedman, but never inquired about an answer to his letter of June 12th; plaintiffs were given no intimation during all this period that a new lease had not been confected; in late January, 1957, Noel, having received a substantially higher offer, after consulting counsel conceived his letter of June 12th to be an offer to renew the lease with plaintiffs, and sought to revoke same. He thereupon called Friedman into his office, advised of an offer to lease the entire tract for a proposed community shopping center, and showed him a previously prepared letter addressed to each plaintiff withdrawing the "offer" of June 12, 1956, for failure of acceptance;[9] on

9. That letter, dated January 22, 1957, but mailed later, stated:

"We addressed a letter to you dated June 12, 1956, in which we offered you conditions and terms, as a proposed basis for extending your lease tenancy with the Noel Estate, Inc. on the Greenwood Road property.

"You have not accepted the offer, neither referring to it, nor acting in any way upon the proposals contained therein. The Noel Estate, Inc. hereby notifies you, therefore, it withdraws the offer, rescinding it completely.

"We have no objection, of course, to discussing your further tenancy with

February 2, 1957, Noel advised plaintiffs by letter that he had a firm offer from the A. & P. Tea Company of $350 per month for each of the 200-foot tracts occupied by plaintiffs, that other lease tenants had signed to occupy the plat in their usual business capacity, that money for improvements was forthcoming, and gave them until Friday, February 8, 1957, to answer in writing whether they would meet the above offer—failing in which they were to remove all their improvements and possessions by the 31st of July, 1957.[10] Defendant's last letter, dated February 12, 1957,[11] indicated that matters had reached an impasse, expressing not only threats of eviction and a damage suit but the novel view that "Your failure to meet their offer or notify us you would vacate the area has extremely dangerous possibilities for you." On February 15, 1957, a written lease was executed between the defendant company

us. We would appreciate greatly your notifying us if you have lost interest in this site as a location for your business."

10. The 1952 lease contained the provision that " * * * improvements heretofore or hereafter made shall be and remain the property of Lessees who shall have the right to remove them at the termination of this lease for any cause."

11. That letter stated: "After a long look at the proceedings between us from August 1, 1949 to the receipt of your certified letters dated February 4, 1957, followed by conversations with Mr. H. B. Frazier [A. & P. representative], and after due deliberation with counsel I have decided on the following course of action, of which I now apprise you.

"Our present intent is to obtain a fully set-forth plan of Mr. Frazier's proposed developments and building improvements, so that a full scale declaration will be on record, and known to you. Thus subsequent claims for damages to be made, arising directly from your failure to respond to our demand of February 2, 1957, shall be known in advance, and in full, by you both. Whatever course of action you choose will be with the full knowledge as to what extent accountability is to be had. Such damages will be outlined to you, not simply as the loss of cash rent but even more so in the loss of equity in the improvements and the buildings which are to become this company's at the end of their lease.

"Both of you are of sufficient means to make up the difference between the seven-hundred dollars ($700.00) per month they offered, and the two-hundred dollars ($200.00) you would have offered had there been no other offer * * * but, as to a thirty percent (30%) equity in a million dollar projected center, I wonder.

"Inasmuch as you both ignored the main subject of our correspondence—the bona-fide offer made in advance of option time—and, since neither of you accepted or replied to my written proposal, in any fashion, for a lease extension, we contend (with full assurance of a fulfilled moral as well as legal obligation) that your joint lease made in July, 1952, does expire on June 30, 1957. Promptly thereafter we will bring an ejection suit to remove you from the premises, and subsequently make the claim for damages done to our Company. Your failure to meet their offer or notify us you would vacate the area has extremely dangerous possibilities for you.

"For a personal note, I would like to signify my suprise at your attitude in our present relationship as compared with the past. You know we have always had your concerns and prosperity at heart. The offers to assist you in any way possible to us still stands through to March 1st, 1957, and then we will proceed as best we may as far as we must."

and H. B. Frazier, the term being fifty years beginning August 1, 1957. The plaintiffs then turned to the courts for a determination of the rights and obligations of the parties.

 We are not impressed with the defendant's alternative defense that there was no corporate authority for the leases at issue here. The corporation is composed of (and all outstanding stock is owned by) W. B. Noel, formerly President, his wife, their son James S. Noel, now President, and a daughter who has resided out of the State; the Board of Directors, according to James S. Noel, is composed of his mother, father, wife and himself. By original charter the President was given all the powers of the corporation without necessity of any authorization by the Board; by an amendment to Article VIII (see footnote 7), recorded on June 3, 1933, the President was deprived specifically of the power to buy and sell, mortgage and hypothecate the property, rights and credits of the corporation without the approval of the Board, leaving him the "power and authority to perform administrative acts only." The defendant corporation's sole business is to lease its property, and by its action has indicated that the "administrative authority" reposing in its President is very broad—as witness the fact that business transactions were invariably conducted by the President and he was the only member of the corporation known to these plaintiffs; it was with the President that all leases were confected, whether oral, or by informal notation of acceptance on a letter written by the President, or by written act under private signature, as in the case of the lease with plaintiffs in 1952, and in no instance is there a resolution of the Board of Directors. It would be difficult to find a more suitable occasion for application of the well settled rule that when, in the usual course of the business of a corporation, an officer has been allowed to manage its affairs, his authority to represent the corporation may be implied from the manner in which he has been permitted by the directors to transact its business. See 7 R.C.L. 623, Sec. 620; also, City Savings Bank & Trust Co. v. Shreveport Brick Co., 172 La. 471, 134 So. 397; Scharfenstein & Sons v. Item Co., 174 La. 794, 141 So. 463; Slagle v. Peyton, 182 La. 358, 162 So. 12, and other authorities therein cited; cf. Morgan v. Cedar Grove Ice Co., 215 La. 741, 41 So.2d 521; Acadian Production Corp. of Louisiana v. Tennant, 222 La. 653, 63 So.2d 343.

For the reasons assigned, the judgment appealed from is affirmed.

SIMON, J., absent.