105 So.2d 233

ESSO STANDARD OIL COMPANY

v.

Maurice J. WELSH (two cases).

Nos. 43072, 43073.

Feb. 10, 1958.

Rehearing Denied in No. 43073
Oct. 7, 1958.

A. M. Curtis, P. A. Casey, W. B. Holcombe, Baton Rouge, J. M. Carville, Plaquemine, D. R. Johnson, Jr., W. W. Erwin, Franklinton, for plaintiff-appellant.

France W. Watts, Jr., Franklinton, H. H. Richardson, Bogalusa, for defendant-appellee.

MOISE, Justice.

These two cases were consolidated for argument in the district court and tried three times by jury. In each instance, plaintiff's demands were rejected and defendant was awarded $35,400 in damages on his reconventional demand in the second matter above listed. After the third hearing, the trial judge rendered judgment in favor of the defendant and stated:

"I do not agree with the verdicts in these two cases because I consider them to be manifestly erroneous as reflected by the evidence and the law applicable thereto. However, I am signing the judgments for the reason the cases have been tried three times by a Jury, and under the circumstances, it is the mandatory duty of the Judge to sign the judgments in conformity with the verdicts. Article 563.2 Code of Practice, State of Louisiana.[1] Franklinton, Louisiana, this 13th day of March, 1956."

Plaintiff appealed, and, in accordance with its original demand, prayed for judgment in its favor in the sum of $7,905.72 with interest at the rate of 4% per annum with 10% attorneys' fees in Suit No. 43,072, and in the sum of $11,883.50 with legal interest from judicial demand in Suit No. 43,073.

A brief statement of facts is necessary for a proper understanding of the matter.

Maurice J. Welsh (defendant) commenced working for the Esso Standard Oil Company (plaintiff) in 1927, as a motor truck salesman. In 1943, after holding va-

---

[1] "No judge shall have the right to set aside the verdict of a jury in the same case more than twice, but should there be three jury trials of the same case, the third verdict shall not be disturbed by the trial judge, who shall render judgment thereon without entertaining an application for a new trial." See, LSA-R.S. 13:4160.

rious types of jobs with plaintiff, he became a consignment distributor at Franklinton, Louisiana.[2] In 1947, Welsh was approached by C. P. Guibet, credit manager for plaintiff, who told him that he was in a jam because of his gambling activities. Welsh made him a small loan and this was followed by incessant demands for more money by Guibet. During 1948, 1949 and 1950, Welsh mailed $35,400 in checks to Guibet, and although they were made payable to Guibet and addressed to him personally, it is the testimony of Welsh that they were to be credited to his running account with plaintiff. Guibet cashed the checks and used the proceeds to pay his gambling debts, and his testimony is to the effect that they were personal loans to him. He admits that several times the envelopes containing the checks were opened by the mailroom, and that upon demand he endorsed the checks to be credited to Welsh's account. In 1951, Welsh received a statement or audit from plaintiff, billing him for $143,000.[3] He testified:

"I received a statement from an auditor to verify my account with Esso Standard Oil Company, which was the first statement I had received for some six, eight or maybe ten months; that statement was from an auditor who was auditing their books I presume, showing I owed $143,000.00; when I received that statement naturally it knocked me cold, because no man in my position could have owed $143,000.-00—I didn't have that kind of money."

Welsh states that he contacted Guibet, who told him he had better verify the audit. He also states the Guibet asked him not to reveal to plaintiff's officials that he had been borrowing money from a customer. Welsh then came to New Orleans to discuss his account with Mr. Peter Rome, Division Manager for Esso Standard Oil Company, and his testimony with respect to this meeting is as follows:[4]

"* * * I did go to New Orleans, and I was met by Mr. C. P. Guibet, the Credit Manager in the lobby of Mr. Rome's office, and he asked me to come into Vic's Office.

"Q. Who is that? A. Mr. P. V. Rome, and I told him let me talk to you,

2. "A Consignment Distributor normally receives his products in a plant that he either owns or leases, and he operates as his own boss, he has his own delivery equipment, and he is in pretty good condition to do as he pleases when it comes to the hours he works and who he hires. He receives his products on consignment, and by agreement he reports such sales as he makes and remits accordingly." Testimony of Peter Victor Rome,

Division Manager of Marketing, Esso Standard Oil Company, State of Louisiana.

3. Mr. Guibet's testimony is to the effect that Mr. Welsh's normal credit was around $30,000.

4. Esso Standard Oil Company's office was located at New Orleans, La.

I have been mailing these checks to you as you told me to, and there must be something wrong here for I have not been given credit for a lot of those checks, I have not checked up to find out just how much, but there is something wrong because I couldn't owe that much money, if I did I was ruined, and he told me, look I have used those checks—I had also given him cash and he had used that cash and I had not been credited with it on my account, he told me * * * He said before going into Vic's office I have a plan and you can help out all concerned, and I told him I am the only one concerned here, and he said don't tell Vic anything about those checks and that money you gave me, don't tell him anything about that, that I told you to mail the checks to me, don't mention it one way or the other; he said you know we have always been friends, I have known you a long time and you have known me a long time, I just made a mistake to use that money.

"Q. Then did you go into Mr. Rome's office? A. We went into Mr. Rome's office.

"Q. What happened? A. Mr. Rome said, Maurice, they tell me you have a pretty large account here, what

about it; I told him well, about that time Mr. Guibet was looking at me across the desk, so I told him I guess I owe the account, and about that time Mr. Guibet spoke up and said I think I can work out a plan on this whereby it will help everyone concerned.

"Q. What did Mr. Rome say? A. He said get out of this office and work it out." [5]

Guibet's testimony is to the effect that he did not instruct Welsh to sign the auditor's statement and made no request of him with respect to the checks.

As a result of the above meeting, Welsh entered into a contract with Esso Standard Oil Company on April 3, 1951, whereby he swore that he had that day delivered to Esso Standard Oil Company, appearing through C. P. Guibet, its credit manager, one hundred and ninety-seven (197) promissory notes (196 were for $750 each and the 197th was for $657.92) in payment or liquidation of his indebtedness on his open account as a Consignment Distributor of Esso Standard Oil Company at Franklinton, Louisiana.[6]

On June 12, 1953, Esso Standard Oil Company granted Welsh a hauling contract, whereby Welsh would transport gasoline, kerosene, naptha and/or other refined petroleum products from North Baton Rouge

---

5. This testimony indicates that Mr. Rome was unaware of the negotiations between Mr. Welsh and Mr. Guibet.

6. This suit is not predicated on these notes.

to Franklinton, Louisiana. The purpose of this contract was to provide Welsh with additional revenue to liquidate the aforementioned notes, and the record shows that approximately $38,000 was paid.

Welsh developed a heart condition, and in December of 1954 he felt he could no longer withstand the strain on his financial condition and the pressure under which he was operating. He revealed to Mr. Rome the story of his relationship with Guibet, and his testimony as to this occasion is as follows:

"I had for the past three years been paying on those notes as explained; Mr. C. P. Guibet was continually hounding me into doing things that should not have been done; he would demand money from me and my commission; he would also have me make invoices on different customers and give an order to offset the stock shortage that would exist after he had taken the money that I had given him; on December 16, 1954, I had stood that system as long as I possibly could, he had me broke, down in the dumps; I went down to Mr. Rome's office and laid that record on his desk and carried those checks; I told him my complete story of what had transpired.

"Q. Did you leave that record with him? A. I left those checks with him, I didn't see Mr. Guibet at all, but I told him the entire story; Mr. Gray was in his office, he heard me tell him.

"Q. Then what happened? A. They asked me why I had not told them before and I told them Mr. Guibet was my superior and I acted under orders from him as Credit Manager, and what he told me to do I had to do or lose my job, and if that was the way I had to hold my job after thirty years service, I wanted no further part of it and I was laying my cards on the table.

"Q. Did you pay Mr. Guibet anything subsequent to the time you gave him the $143,000.00 of notes? A. Yes sir, I was always paying him money, I had paid him in cash.

"Q. You never gave him another check? A. No sir."

The record further reflects that Welsh faked six invoices; that is, the Esso Standard Oil Company accepted these invoices as payment on Welsh's account, when, in reality, these customers never received the delivery of petroleum products listed on the invoices. It is Welsh's testimony that he was paying money to Guibet and that it was at Guibet's insistence that he faked the invoices for the purpose of credit. On December 28, 1954, Welsh executed a promissory note for $7,905.72, secured by chattel mortgage, in favor of Esso Standard Oil Company. This note represented his promise to pay the invoices.

In December of 1954, the Esso Standard Oil Company discharged Guibet from its employ, and on January 6, 1955, it cancelled Welsh's contracts by the following instrument:

"The parties hereto do by these presents mutually cancel and terminate effective 5:00 P.M. on the 6th day of January, 1955 certain agreements listed below:

"(1) Agreement of Lease covering bulk plant at Franklinton, Louisiana between Esso Standard Oil Company and Maurice J. Welsh, effective July 1, 1954.

"(2) Consignment Distributor Agreement between Esso Standard Oil Company and Maurice J. Welsh, dated July 1, 1950.

"(3) Motor Tanktruck Tank Equipment Lease between Esso Standard Oil Company and Maurice J. Welsh, covering 1,822 gal. Capacity 4-Compartment tank, Equipment L-157 dated August 6, 1953.

"These agreements are terminated subject to a final accounting and payment to be made between the parties therefor for any unpaid balances due thereunder.

"In Witness Whereof the parties hereto have executed this instrument on the day and year hereinabove first written.

"Witness: /s/   Maurice J. Welsh.[7]

"/s/ J. A. Lightfoot, Jr.        Esso Standard Oil
                                              Company
                                      Louisiana Division
"/s/ Laura A. Welsh            /s/ J. C. Wilbourn"

On January 15, 1955, Esso Standard Oil Company brought the present Suit No. 43,073 to recover the following alleged indebtedness of Welsh:

| | |
|---|---|
| Unpaid Bulk Plant Rental ......... | $ 105.00 |
| (P-4; Tr. 14, 20) | |
| Unpaid Motor Equipment Rental ... | 15.30 |
| (P-5; Tr. 20) | |
| Unpaid Federal Gasoline Tax ...... | 110.00 |
| (Tr. 20-21; P-9) | |
| Unpaid Balance on Truck Tank .... | 480.44 |
| (Tr. 22; P-10) | |
| Amount Due on Guarantee of Arthur Mizell Account ................... | 1,000.00 |
| (Tr. 22-23; P-10; P-11; P-12) | |
| Amount Due on Guarantee of Floyd Jenkins Account ................... | 1,699.65 |
| (Tr. 22, 24; P-14) | |
| Unpaid Balance in Payment Variations Account: | |
| As Stated in Suit ................$3,675.23* | |
| LESS: | |
| Rejected Invoice No. 20,347 paid by customer .....................$ 75.00 | |
| Credit for hauling products ...... 46.50 | |
| Sales Tax not billed on assigned invoice but paid by customer ... 2.80 | |
| Total Deductions (Tr. 149-150) ....$ 124.30 | 3,550.93 |
| Unpaid Stock Shortages ............ | 4,918.47 |
| (Tr. 28, 31, 34-35; P-21; P-22; P-23; P-24; P-25; P-26; P-27; P-28; Tr. 45, 53, 56, 141-142) | |
| Unpaid Purchase of Lubricating Oil .............................. | 3.71 |
| (Tr. 31-32) | |
| Total Amount on Account ......... | $11,883.50 |
| (Tr. 149-150; P-41) | |

On January 11, 1955, Esso Standard Oil Company filed the present Suit No. 43,072, for recovery on the promissory note for $7,905.72, supra.

---

**7.** It is to be observed that Welsh signed the cancellation agreement, and his wife signed as a witness.

The defendant pleaded want and failure of consideration to both suits filed by plaintiff. In reconvention he set forth the alleged fraud of Guibet and outlined in detail the events above related. He prayed for $200,000 as damages for the cancellation of his contract as Consignment Distributor, for the return of the notes he had executed, supra, and for exoneration of all indebtedness to the Esso Standard Oil Company.

Except for a reduction to $35,400 for damages, the jury acceded to Welsh's prayer.

After reading the testimony of record, we conclude that the officials of the Esso Standard Oil Company were not aware of the transactions taking place between Welsh and their credit manager, Guibet. They thought that Guibet had over-extended Welsh's credit, which had reached approximately $143,000, and they did suspend him for this infraction. However, he was reinstated and given an opportunity to collect this account. As credit manager, Guibet was empowered to exercise wide discretion, and the actions of his superiors indicate that they trusted him implicitly. However, when Welsh revealed the true situation to them in December, 1954, they took immediate action.

The record conclusively shows that Welsh paid $35,400 to Guibet in checks and that Guibet gambled the proceeds. Welsh testified that this money was to be applied to his account, and his testimony is far more persuasive than that of Guibet, who stated that the checks were personal loans. In fact, Guibet's testimony reveals that it was not uncommon for customers to make payments by checks made payable to the credit manager. Under such circumstances, we find that Esso Standard Oil Company was responsible for Guibet's actions and Welsh should be allowed credit for the $35,400 paid to Guibet.

" 'It is now well settled that when, in the usual course of business of a corporation, an officer has been allowed to manage its affairs, his authority to represent the corporation may be implied from the manner in which he has been permitted by the directors to transact its business. This is only the application of the principle that usual employment is evidence of the powers of an agent and the principal is held responsible for the acts of his agent within the apparent authority conferred on the agent.' 7 R.C.L. 623. See, also, Fletcher on Corporations, § 2098; Corpus Juris, vol. 14A, pp. 423, 424, § 2275; City Savings Bank & Trust Co. v. Shreveport Brick Co., 172 La. 471, 134 So. 397; Uline Loan Co. v. Standard Oil Co., 45 S.D. 81, 185 N.W. 1012, 27 A.L.R. 585." Slagle v. Peyton, 182 La. 358, 162 So. 12, 15. See, also, Trichel Contracting Co. v. Little Creek Oil Company of Louisiana, Inc., La.App., 84 So.2d 874.

■ Counsel for plaintiff urges that the defendant did not plead payment. While it is true that the defendant did not specifically plead payment by name, we think that the gist of his answer and reconventional demand is that he had overpaid his account. This was sufficient conformity with Article 346 of the Code of Practice.

■ This Court has held that whoever deals with an agent is put on his guard by the very fact and does so at his risk. Buckley v. Woodlawn Development Corp., 233 La. 662, 98 So.2d 92. But, the record in the instant matter definitely shows that the rank and dignity of the position of plaintiff's credit manager implied no risk.

There is no denial in the record that defendant paid $38,000 on the series of notes which he signed. We deduce that defendant contends that this $38,000, plus the $35,400 previously mentioned and the cash he avers he gave Guibet, far overpaid his account.

■ The record contains vouchers, invoices, and cancelled checks, but there is no balancing of accounts. The present claim is on an open account, which, except for two guaranteed customers' accounts, was incurred in 1953 and 1954. This alleged indebtedness is, therefore, partially disassociated with the contract of April,

1951, whereby defendant admitted that he owed plaintiff approximately $143,000.

With such a presentation of facts and insufficient testimony, we are unable to pass upon the correctness of plaintiff's claim, and we have no other course than to remand the matter to the trial court for a proper accounting. Its determination must take into consideration the $35,400 Welsh paid Guibet, for which he must be given credit. The $38,000 paid by defendant following the contract of 1951, supra, is attributable to the one hundred and ninety-seven notes he signed, which are not the basis of this suit.

■ The jury allowed the defendant $35,400 damages for the cancellation of his contracts with plaintiff. An examination of the record convinces us that defendant was not entitled to these damages. Although he was ill with heart trouble at the time he signed the contract of cancellation, there is no evidence in the record to show that he did not know what he was doing. His wife was a witness to the act, and its contents reflect a mutual consent. LSA-C.C. Article 1901.

■ Defendant argues that there was no consideration for the $7,905.72 note, which he gave plaintiff to cover six forged invoices, supra.[8]

8. Washington Parish Police
 Jury ....................$1,347.50
 Washington Parish Police
 Jury .................... 1,290.72

Town of Franklinton ........ 1,225.00
Town of Franklinton ........ 1,347.50
W. J. Richardson Gin Co. .... 1,347.50
W. J. Richardson Gin Co. .... 1,347.50

"Every negotiable instrument is deemed prima facie to have been issued for a valuable consideration; and every person whose signature appears thereon to have become a party thereto for value." LSA–R.S. 7:24.

We do not find that defendant has rebutted the presumption that this $7,905.72 note was given for consideration or value received. In fact, we find that plaintiff's crediting of defendant's account with four fraudulent invoices was adequate consideration. Defendant received credit for something he did not sell, and it was incumbent upon him to remunerate plaintiff. This he did in the form of a note (LSA–R.S. 7:25), which he must pay. Guibet's influence on him to turn over fraudulent invoices to plaintiff would have no bearing on this note.

■ Counsel for appellee, with great zeal and ability, argues to this Court that the verdict of a jury on the facts should not be disturbed unless manifestly erroneous. Learned counsel has adopted, as a premise, an incorrect syllogism when applied to the facts, and such does not syllogize. His theory in this case is a pure abstraction, a thing supposed.

The issue here is—who was in a better position to judge under the circumstances, the jury which rendered the verdict or the trial judge?

It is to be observed that there were three jury trials. The testimony taken at the first trial was read to the jury at the second trial, and the second jury heard Guibet, the credit manager for the Esso Standard Oil Company. This witness did not testify in the first trial and was called by the Court to testify in the second trial. The third jury neither saw nor heard the witnesses; the testimony taken at the first and second trials was read to the third jury.

The trial judge is the only one who saw and heard all of the witnesses, and we quote in part his statement set out in full, supra:

"I do not agree with the verdicts in these two cases because I consider them to be manifestly erroneous as reflected by the evidence and the law applicable thereto. * * *"

For the reasons assigned, the verdict of the jury, in Esso Standard Oil Company v. Maurice J. Welsh, No. 43,072 of the Docket of this Court, exonerating Maurice J. Welsh of his obligation to pay Esso Standard Oil Company a demand note for $7,-905.92, together with 4% per annum interest and attorney's fees, is reversed and set aside, and it is now ordered that such be paid by Maurice J. Welsh, together with costs.

FOURNET, C. J., and McCALEB, J., concur in the decree.

SIMON, J., absent.