171 So.2d 820 (1965)
Jack ROGERS, Plaintiff-Appellant,
v.
FIRST SEWERAGE DISTRICT OF the CITY OF LAKE CHARLES et al., Defendants-Appellees.
No. 1338.
Court of Appeal of Louisiana. Third Circuit.
February 10, 1965.
Rehearing Denied March 3, 1965.
*822 Rogers, McHale & St. Romain, by Robert M. McHale, Lake Charles, for plaintiff-appellant and Nathan A. Cormie, Lake Charles, for plaintiff-appellant.
Warren E. Hood, Lake Charles, for defendant-appellee.
Before TATE, FRUGE and CULPEPPER, JJ.
TATE, Judge.
This is a suit to enjoin the defendant sewerage district and its president from discontinuing sewerage disposal service for the plaintiff's residence. The plaintiff appeals from the dismissal of his injunction suit.
The plaintiff Rogers's home is located outside the limits of the defendant sewerage district. He contends that, prior to building his home, he obtained permission in June 1962 from the district through its then president to connect with a sewer main line serviced by the district. However, in December, 1963, about eighteen months later and after he had built his home, the sewerage district board notified the plaintiff through a new president, that his tie-in with the sewerage system was to be disconnected for the reason that "it is against the law for anyone to connect with a sewerage line without express permission from the board of commissioners". This injunction suit followed.
The sewerage district contends, first, that it cannot legally furnish sewerage disposal services to private residences outside the limits of the sewerage district. It is further contended that the plaintiff was not expressly authorized by the district to connect his residence with the sewerage disposal system.[1]
Before discussing the particular questions of the present appeal, it may be advisable to summarize the applicable general legal principles, as set forth in the treatise sources cited below and the decisions cited by them:
Property owners have no right to connect with a municipal sewer without the consent of the governing body of the sewerage district. The district thus may at any time compel the disconnection of unauthorized users. However, once permission to connect has been given by the district to one authorized to receive service, the governing body may not thereafter disconnect sewerage service to him unreasonably, arbitrarily, or discriminatorily. A consumer *823 connecting with the sewerage system impliedly agrees to pay any fair, reasonable, and non-discriminatory charges to be fixed by the governing authority.
Permission to connect with public sewers is a license which ordinarily may be revoked for sufficient cause, even though expenditures may have been made by the user in reliance upon the permission to connect. A permit to connect to a sewerage system does not ordinarily create a vested right; it is generally subject to modification or termination by lawful change in general regulation, as well as subject to revocation for non-arbitrary cause.
The governing authority is under no obligation to serve anyone outside the territorial limits. Nevertheless, if it does consent to afford such services and is legally authorized to do so, it may not disconnect in an arbitrary or discriminatory manner. Good causes to disconnect may be, for example, that the system is no longer able to dispose adequately of sewerage from locations outside the district, or that the particular sewerage connection has become a nuisance, or that special fees assessed to non-district users have not been paid.
See: 11 McQuillin Corporations (3rd ed., 1951), "Sewers and Drains", Sections 31.30 (p. 235), 31.31 (p. 243); also 64 C.J.S. Municipal Corporations § 1805, at pp. 265-273. (No Louisiana decisions were cited to us, nor could we find any in point.)
The present case was tried below and argued before us on the assumption that the defendant sewerage district was not authorized by law to furnish disposal services to locations outside the district.
This may have been a valid assumption under the original enactment of Louisiana Act 285 of 1908 (see especially Section 2), under which the defendant district was originally organized. However, there have been subsequent legislative amendments which, contrary to the assumption, specifically authorize a 1908-Act district to provide sewerage to non-district users.
By these amendments, which were in effect at all times pertinent to this litigation, a sewerage district organized under the 1908 act is additionally authorized "To extend the sewerage pipes and mains outside of the limit of the sewerage district, and to use therefor funds which accrue from the tax levied in excess of the amount necessary to retire the bonds and the interest thereon." LSA-R.S. 33:3933(6). Prior to the amendment providing this authority, 1908-Act districts already had the power to construct, outside the district, outlets or other appurtenances necessary to furnish service to users inside the district, see LSA-R.S. 33:3933(2), and to use the proceeds of bonded indebtedness for this purpose, LSA-R.S. 33.3933(3), as well as to use excess tax revenue to maintain and operate such systems, LSA-R.S. 33:3933 (4). The additional authority provided by this amendment thus was designed specifically to permit sewerage districts to afford sewerage disposal services for locations outside the district, and to use district tax funds for this purpose.[2]
The district contends with considerable force that the plaintiff's property, outside the taxing district, cannot by law be entitled to the use of sewerage facilities and services paid for by taxpayers within the district. See Opinions of Louisiana Attorney General 1956-1958, p. 654. This argument falls, however, because of the specific legislative authorization for the sewerage district board to use tax funds to extend its mains and service pipes beyond the taxing territory of the districts (possibly for reasons *824 of general health and sanitation benefiting generally those within as well as those without the taxing district.)[3]
The evidence further reflects that, at least prior to the present attempt to disconnect the plaintiff in late 1963, the defendant sewerage board had never adopted any resolution or ordinance prohibiting consent to non-district users to connect to district mains; nor had it ever before followed any fixed policy to this effect. (In fact, the evidence shows that the district had at some times even required nearby non-district locations to connect with district sewerage lines, see LSA-R.S. 33:4041, and that the district during former administrations had permitted numerous, perhaps several hundred, non-district users to connect to the district sewerage lines. The evidence further reflects that there is at this time sufficient capacity to service all these non-district users.)
The above-cited statutory provisions specifically authorize service to users outside the district. They are extremely relevant to determination of the present question because, if the furnishing of the services had indeed been ultra vires or unauthorized by law, the general rule is that plaintiff's right to continued illegal services could not be validated by express or implied consent of the sewerage district for him to connect, or by estoppel because of detrimental reliance by him upon the district's explicit or apparent authorization, or by a customary course of conduct of the district permitting many others similarly situated to plaintiff likewise to avail themselves of services prohibited to them by law. 31 C.J.S. Estoppel §§ 138, 142b, 143, pp. 675, 706, 719; 62 C.J.S. Municipal Corporations § 173, p. 331; 64 C.J.S. Municipal Corporations § 1805, p. 269.
However, in the present instance, the furnishing of sewerage services to the plaintiff's home outside the sewerage district was not prohibited by statute or district ordinance. Instead, the district was authorized by law to do so (providing, of course, that the governing authority of the district had indeed consented to the plaintiff's connection to the sewerage line serviced by it). Therefore, as stated by our Supreme Court, in applying such principle in State ex rel. Shell Oil Co. v. Register of State Land Office, 193 La. 883, 192 So. 519, 521 (omitting italics):
"`Although a municipality or other governmental agency cannot be estopped by its ultra vires acts, there is nevertheless a broad distinction to be observed between an irregular exercise of a granted power, and the total absence or want of power; and the rule is that it may be estopped, as right and justice may require, where the act or contract relied on to create the estoppel was within its corporate powers, although the method of exercising the power was irregular or unauthorized * * *.'"
See also 31 C.J.S. Estoppel § 144, p. 722.
In summary, therefore, it was within the legal authority of the sewerage district to afford sewerage disposal services to the plaintiff's home located outside the district limits.
The sole other contention by the defendant district is that it may disconnect services to plaintiff because it had never expressly authorized him to tie-in to the sewer main serviced by the district. Restating the legal question before us in the light of the legal authorities previously referred to, the only question remaining for our determination, *825 then, is whether the defendant sewerage district expressly or by implication consented to the plaintiff's connection to its sewerage system, or is estopped to deny that its officers or agents were authorized to permit the plaintiff to do so.
The facts surrounding the plaintiff's initial connection to the sewer main are as follows:
The plaintiff Rogers had purchased a large lot across the street from the new Marion High School. The school was serviced by a sewerage line which ran approximately forty feet from the plaintiff's premises. Before building a large new home on this lot, the plaintiff contacted both the school board and also Mr. Walter Goos, then the president of the defendant sewerage district board, requesting permission to connect his home sewerage disposal outlet onto the sewer main which serviced the school.
The school board by formal resolution of June 5, 1962, granted permission, providing the tie-in be approved by the sewerage board. The sewerage board president had written to the school board to the effect that the sewerage board had no objection to the plaintiff connecting onto the school's sewerage main.[4]
Thereafter, on June 22, 1962, the plaintiff applied in writing to the sewerage board to connect onto the public sewer; his application was approved that date by the plumbing inspector's secretary. See P-2, Tr. 38. Although it is now contended that the secretary did not realize that the plaintiff's location was outside the sewerage district, the plumbing inspector himself fully did know that the location was outside the district, and the inspector in June, 1962 formally approved the connection as adequate. See P-7, notation at Tr. 43. In fact, at the direction of the sewerage board president, this inspector had, even prior to the plaintiff Rogers's application for connection, consulted with him to help him in planning the connection. The record further reflects that the inspector sat in at sewerage board meetings and was completely familiar with sewerage board policies and procedure.
The former sewerage board president stated that all outside-district connections were handled in generally the same manner as had been the plaintiff Rogers's: By application to the president, who, after informing members of the board and receiving no objection, informed the prospective user to this effect, with the tie-in subsequently inspected and approved by the sewerage district inspector.
The other sewerage commissioners did not recall ever approving the application. However, they all remembered that the subject of Mr. Rogers's request to connect had come up informally at a sewerage board meeting. While the commissioners stated they had not approved the connection, they also indicated they had not at the time objected to the connection. There is no minute entry reflecting any discussion concerning the matter or any action taken by the board.
Insofar as the board now contends that the Rogers's connection was unauthorized because not expressly approved, we think the evidence reflects that consent to connect was obtained in the same manner as by all other non-district users, namely, through the sewerage board president's informal approval when there was no objection by the other sewerage commissioners. The evidence further reflects that, at least at the time that the Rogers's connection was made, the board customarily permitted the sewerage *826 board president a large degree of supervision of the affairs of the district.
Under the circumstances, it is doubtful to us that the actions of the sewerage board, including its permit to connect in writing and the subsequent inspection and approval in writing, did not amount to express consent for Mr. Rogers to connect. Although the board members themselves at the time did not believe they could legally afford services to those outside the district, their customary method of permitting connections of such users was followed in the instant case. Their failure to reject an express application to connect could reasonably, under the circumstances, amount to a consent for the non-district user to connect with the district's sewerage mains. As previously noted, a consent to such a non-district user is in fact not ultra vires or beyond authority of the sewerage board to confer.
At the very least, however, the actions of the sewerage board constituted an implied consent to the plaintiff to connect with the sewerage mains, with the permission of the sewerage board president, who had been permitted by the board to exercise such administrative responsibilities. The president was thus clothed with apparent authority to act for the board in the matter; the board is therefore responsible for the president's act within his apparent authority, or at least estopped to deny that he did not have authority to permit the plaintiff to connect. Esso Standard Oil Co. v. Welsh, 235 La. 593, 105 So.2d 233; James v. Judice, La.App. 3 Cir., 140 So.2d 169.
We should note that actually it is not shown that, at the time, formal board approval was required of administrative actions of the president concerning applications to connect with the sewerage mains. If there were such a requirement, however, there is a general rule that the sewerage governing authority "may waive requirement as to form of permit either expressly or by a course of conduct which indicates an intention to do so, or it may be estopped to object." 11 McQuillin, cited above, Section 31.31, at p. 244. See Hack v. City of Detroit, 322 Mich. 558, 34 N.W.2d 66 (1948), where, under this principle, a governing board was held estopped to deny prior informal consents to connect, the attempted denial being based upon the customers' non-compliance with a specific requirement for formal board approval before connection.
The evidence clearly shows the plaintiff's detrimental reliance, sufficient to support estoppel, upon the apparent consent to connect given to him by the board representatives. In reliance upon such implied consent, he constructed on his lot a home costing in excess of $65,000, with the home being so constructed as to take up every portion of his lot. There is not only no place on his premises for a septic tank, but also the evidence shows that, due to what an engineer described as "a very poor percolation capability" of the soil (Tr. 231), septic tanks in that neighborhood can not efficiently dispose of sewerage but instead flood up and overflow. Unless the plaintiff is permitted to continue to connect to the sewerage main, there is no other means by which he can accomplish sewerage disposal from his home, except to run it into an open ditch across the street from the school.
We conclude that the sewerage district is therefore estopped to claim now that the plaintiff did not have permission to connect with the sewerage system, if indeed there is not the requisite express consent. Permitting the connection was within the corporate powers of the board. The connection was accomplished according to the customary procedure of the board and within the apparent authority delegated by the board to its president and its employees concerned. Although the method of exercising the power may arguably have been either irregular or technically unauthorized, the board is estopped to deny now that at the time the board officers and employees had authority to permit the plaintiff to connect his home *827 with the sewerage main serviced by the board, especially in view of the detrimental reliance of the plaintiff upon such apparent consent and the extreme hardship which will result if the board is now permitted to disavow its prior implied (at least) authorization.
Accordingly, an injunction to prevent disconnection should issue as prayed for by the plaintiff-appellant.
To clarify our holding and to prevent any future misunderstanding, we have simply held herein that the sewerage district is not authorized to disconnect the plaintiff Rogers upon the only ground claimed by it, namely, that the plaintiff did not have permission to connect his residence with the district's sewerage system. We do not mean that the defendant board is not entitled hereafter to disconnect the plaintiff or any other non-district user for any non-arbitrary cause, such as, for example: those who did not have its express or implied permission to connect into its sewerage system; those who do not comply with reasonable board regulations; if the capacity of the system becomes insufficient to serve them; if any connection made becomes a nuisance; those who refuse after demand to pay an appropriate charge for the sewerage services afforded them by the district.
For the reasons assigned, the First Sewerage District of the City of Lake Charles and its President are enjoined from interfering with the plaintiff's right of use of the sewerage line running between his residence property and terminating on the sewerage line which furnishes Marion High School. The issuance of this injunction is without prejudice to the right of the defendants in the future to disconnect services for non-arbitrary cause, consistent with the holding and the views expressed herein.
Reversed and rendered.

On Application for Rehearing.
En Banc. Rehearing denied.
HOOD, J., recused.
NOTES
[1] No contention is made in these proceedings that the sewerage district does not have the facilities to service the plaintiff and other users located outside the sewerage district limits; nor is there any contention before us that the plaintiff's connection was physically improper or constituted a nuisance, or that it did not comply with sanitary regulations of the district.
[2] Like provisions apply to sewerage districts organized pursuant to Act 26 of 1926 (LSA-R.S. 33:3911-33:3915), see LSA-R.S. 33:3912. We note this because the defendant sewerage district elected, effective January 1, 1963, to be governed by the 1926 instead of the 1908 act, an election authorized by LSA-R.S. 33:3915.
[3] Presumably implicit in the authorization to furnish services outside the taxing district is the power to be recompensed by service charges or payments in lieu of taxes for sewerage disposal services voluntarily afforded by the district to users outside the taxing territory. The plaintiff's counsel has stated, for instance, that the plaintiff is perfectly willing to pay appropriate charges for the sewerage disposal services rendered to his home premises. However, this question is not before us now, and we do not pass upon it.
[4] See P-5, Tr. 41, letter of May 29, 1962: "In regard to the sewerage line that runs between Marion Senior High School and the old Marion School, I have been requested by Mr. Jack Rogers to state whether or not the line is capable of carrying the additional sewerage of one additional family on the line. In my opinion, the line is quite adequate to stand this additional load, and the placing of an additional single dwelling on this line should not affect the service of the line to the school in any way. The line is quite adequate to stand the additional load."