204 So.2d 690 (1967)
NEW ORLEANS FIRE FIGHTERS ASSOCIATION LOCAL 632, AFL-CIO and Oliver A. Bayard
v.
CITY OF NEW ORLEANS.
No. 2736.
Court of Appeal of Louisiana, Fourth Circuit.
December 4, 1967.
*692 Dodd, Hirsch, Barker & Meunier, Thomas J. Meunier, C. Paul Barker, New Orleans, for plaintiffs-appellees.
Alvin J. Liska, Beuker F. Amann, and Jackson P. McNeely, New Orleans, for defendant-appellant.
Before YARRUT, SAMUEL and HALL, JJ.
YARRUT, Judge.
Plaintiffs, the New Orleans Fire Fighters Association and its president, Oliver A. Bayard, allege the following:
(1) The Union entered into an oral contract with the Defendant, City of New Orleans, effective January 1, 1966, under which all members of the Department were to work 52 hours per week at a fixed monthly salary; four hours mandatory overtime at a premium rate; and such additional overtime, when offered to them by the City, as they chose to work over the mandatory 56 hours.
(2) On January 8, 1967, after a meeting of its Executive Committee, the Union sent a letter to Mayor Victor H. Schiro of the City of New Orleans, informing him it had been negotiating for improvements in working conditions since August, 1966 without avail and, therefore, intended to boycott voluntary overtime effective 8:00 A.M. January 15, 1967, unless twelve of its demands were met.
(3) On January 15, 1967, Thomas G. Heier, Chief Administrative Officer of the City, declared a state of emergency under LSA-R.S. 33:1994, which makes it mandatory for firemen to work in excess of 60 hours per week. At this time the firemen were also informed they would have to work 60 hours, at the regular monthly pay, and receive overtime pay only for work in excess of 60 hours per week; and would further be required to work as many hours over 60 per week as was necessary.
Plaintiffs urge this declaration of emergency and the rules promulgated thereunder, constituted a breach of contract. They prayed, inter alia, for an injunction against the City forbidding it to put the new work rules into effect, and for a declaratory judgment that there was no state of emergency at the present time. (Other relief prayed for is not an issue here.)
The Trial Judge enjoined the City, its officials and agents, from requiring any work week or overtime, contrary to the previously approved and scheduled work week of 52 hours a week plus four hours of mandatory overtime and voluntary overtime, in excess of 56 hours per week; the injunction to remain in effect until such *693 time as both parties mutually agreed to any change, or until the Legislature of Louisiana, or the New Orleans City Council, should, by statute or ordinance, change the existing work week and overtime policy. He further decreed that there was not at present a true state of emergency but, should such emergency occur and be declared as such by the authorized governing body of the City, the injunction would be suspended during the existence of this emergency. From this judgment the City has appealed.
The City reurges an exception of no cause or right of action, and makes the following defenses on the merits: (1) that no agreement was ever entered into; (2) that if such a contract existed, it was null because it contained a potestative condition; (3) that it was null because it was never approved by the City's Department of Finance; (4) that if the contract was valid, the Union breached it when it threatened to boycott voluntary overtime; and (5) that a true emergency does exist.
We agree with the Trial Judge's reasons for overruling the exception of no cause or right of action, and adopt them as our own, viz:
"The City of New Orleans further contends, in its exception of no cause or right of action, that this suit is improperly brought, and that plaintiffs' complaints should be made to the Civil Service Commission. In support thereof, it relies on Louisiana Constitution Article 14, Section 15(I), which provides in part:
`There is vested in the State Civil Service Commission and in the appropriate City Civil Service Commissions for the several cities respectively the authority and power, after public notice and public hearing, to adopt, amend, repeal and enforce rules which shall have the effect of law, regulating employment, transfers, promotion, removal, qualifications, and other personnel matters and transactions, and employment conditions and disbursements to employees, and carrying out generally in the foregoing respects, and as may be otherwise necessary to that end, the provisions and purposes of Civil Service as herein provided, including but not by way of limitation, rules * * *
`(6) establishing and recommending hours of work, provided that the rules establishing the hours of work shall not become effective until approved by the governor or governing body of the City, as the case may be;
`(7) providing for attendance records, conditions for payment of salaries, * * *'
"From the above-quoted provision, it clearly appears that the governing body of the City must approve any `hours of work' which may be recommended by the Civil Service Commission. The Commission does not have the power to finalize the hours of work. They may and should recommend. The final and only authority to set the hours lies with the governing authority of the City. The City, not the Commission, is the `contracting party.' The evidence in this case, particularly that of Mr. Shaw, the Civil Service Director, shows that the Commission never adopted any rules pertaining to the hours of work nor have any recommendations been made to the City pertaining to the hours of work. The fact remains that the City did act and set up hours of work without the recommendation of the Civil Service Commission. Can it now be heard to deny its authority to so act? We are of the opinion that the City had the right and should act in setting hours of work even if the Civil Service Commission fails to recommend, as it had a right to do under the Constitution. The failure of one body to perform its Constitutional function should not invalidate the actions of the governing authority of the City, which carried out its necessary, essential *694 Constitutional function. Nor can the City now be heard to say that it did not function properly in the instance when it first set the hours of work, and at the same time, urge that it may now impose, through the Chief Administrative Officer, any hours of work of whatever magnitude he deems advisable. The exception of no right or cause of action is overruled."
With regard to the existence of the contract, the Trial Judge found, as a matter of fact, that such an oral agreement was mutually agreed to by the parties; and we agree there is sufficient evidence in the record to warrant this conclusion. It is undisputed that the Union and the City had numerous discussions in 1965 concerning wages and hours and that, from January 1, 1966, until January 15, 1967, the firemen were, in fact, working under the agreement they claimed they entered into with the City. Further, Mr. Bayard testified that this agreement was the result of negotiations between the Union and the City. In addition, Mr. Heier admitted the existence of the agreement in the following testimony:
"Q. Were they working a regular work week schedule at that time [during 1966]?
"A. 52 hours.
"Q. What about any overtime. Was there any overtime?
"A. Yes, they had the officials of the Union had agreed that they would work a minimumthey would work 4 hours on a mandatory basis, that everybody would do this, and the men would have the opportunity of working voluntary overtime after 56 hours * * *" (Emphasis added.)
Because the agreement with the Union was such that any overtime work in excess of 56 hours would be on a voluntary basis, the City claims the contract contained a potestative condition and is therefore null under LSA-C.C. arts. 2024 and 2034. We do not agree with this contention. Although the firemen had the power to volunteer or not volunteer to work overtime for any hours in excess of 56 hours per week, this power was limited and depended upon the City's right to offer such overtime work as it deemed necessary. The City did not bind itself to give overtime work for any specific duration. The tenor of LSA-C.C. art. 2024 presupposes a condition where the happening of an event is solely within the power of one of the parties to the contract. In this case the happening of the event, i.e., the working of overtime, is dependent upon both parties exercising their rights at the same time, namely, the City offering and the firemen accepting. The contract, therefore, is not subject to a potestative condition.
In support of its contention that the contract is null because it was never approved by the Department of Finance, the City cites Section 6-307(2) of its Home Rule Charter which provides, inter alia:
"Prior to signature, contracts involving financial obligations by the City shall be approved also by the Department of Finance as to the availability of funds in the amounts and for the purposes set forth therein. Such contracts shall not extend beyond the term for which an appropriation to finance such obligations shall have been made * * *"
We agree with the Trial Judge's answer to this contention, viz:
"Defendant now seeks to avoid that agreement by pleading that it does not have the power to do so without the annual approval of the Director of Finance. It is evident that the requirement of the Director's approval is not applicable in this situation. This is an agreement which determines the hours of service one of the parties will provide and although the salaries to be received are affected by such an agreement, it is only *695 incidental thereto. The terms of this agreement do not directly concern financial obligations so as to require the Director's approval."
We also agree with the Trial Judge's general conclusion that the City, in accepting the benefits of the agreement, is now estopped from denying that it had the authority to enter into it.
With regard to the Union's alleged breach of contract, it is to be noted that in its communication of January 8, 1967, to Mayor Schiro it stated it intended to boycott all voluntary overtime. We do not find that this was a breach because, under the agreement, each fireman was free to accept or reject any overtime after 56 hours and what the Union members could do individually, they certainly had the right to do collectively.
There remains the question of whether or not a true emergency exists. It is undisputed that since 1961 there has been a shortage of firemen which has been increasing steadily from year to year and, in order to make up for this shortage of manpower, the firemen have been working a considerable amount of overtime. The crucial question is: Did the threat to boycott voluntary overtime constitute an emergency? An emergency has been defined as follows:
"[I]t is more commonly used and generally understood to mean a sudden occurrence or exigency, implying imminent danger which leaves no time for deliberation, or a sudden or unexpected necessity requiring speedy action; and as a generalization, it is a sudden or unexpected event which creates a temporarily dangerous condition usually necessitating immediate or quick action." 29A C.J.S. pp. 140-141.
We do not find that the threat to boycott voluntary overtime was a sudden occurrence implying imminent danger, but was rather an aggravation of a chronic condition, i.e., the shortage of firemen in the City.
For the above reasons, the judgment appealed from is affirmed; Defendant to pay all costs taxable to it.
Judgment affirmed.