372 So.2d 245 (1979)
LOUISIANA PAVING COMPANY, INC.
v.
STATE of Louisiana Through the DEPARTMENT OF HIGHWAYS.
No. 12627.
Court of Appeal of Louisiana, First Circuit.
May 29, 1979.
O. P. Barnes, III, Monroe, for plaintiff-appellee Louisiana Paving Co., Inc.
Sharon P. Frazier, Baton Rouge, for defendant-appellant State of Louisiana, Dept. of Highways.
Richard B. Sadler, Alexandria, for third party defendant-appellee Lambda Const. Co., Inc.
Before LANDRY, COVINGTON and PONDER, JJ.
LANDRY, Judge.
Defendant (Department) appeals from judgment awarding plaintiff (Paving) $65,390.00, on the basis of equitable estoppel, *246 for work performed by Paving as subcontractor of Lambda Construction Company, Inc. (Lambda), prime contractor for construction of a road project for the Department. The work performed by Paving was executed pursuant to a verbal agreement between Paving and the Department's employees. Paving has answered the appeal requesting an increase in the award. We affirm.
On January 28, 1971, the Department entered into a written contract with R. C. Asphalt, Inc. (now Lambda) for construction of State Project 8-09-21, the Chamber-Alexandria Highway, Rapides Parish. The contract was to be executed in accordance with the Department's Specifications for Roads and Bridges (October, 1966) as modified by special provisions and plans on file in the Department's Baton Rouge office. Lambda subcontracted with Paving to perform the earthwork required for the project, in strict compliance with the terms of the prime contract "and to the satisfaction of and in compliance with the directions of the Owner or Owner's Engineers." The Department's refusal to pay Paving for certain work performed in deviation from the prime contract prompted this litigation. In essence Paving maintains the deviation was authorized by the Department's engineer and the Department defends on the ground the deviation was not authorized in writing as required by the prime contract.
The dispute is over the placement and movement of a five foot dirt surcharge at three different locations on the project. Surcharging is the placing of surcharge material (dirt) on the roadbed for a period of 90 days to test the roadbed for stability, that is, to determine whether it will subside under the weight. The contract required a surcharge of five feet of dirt excavated from a nearby borrow pit, said dirt being classified as "special borrow excavation" under the contract. Payment for surcharge on the project was fixed at a unit price of $1.95 per cubic yard. The volume of surcharge utilized was determined by cross-sectioning the borrow pit.
As regards surcharge, Sheet 35, Part II, of the project plans provides:
"Placing and Removing the surcharge will be paid for under Item No. 203(5). The cost of trimming the embankment to its final dimensions after the surcharge is removed will also be included in the price bid on Item No. 203(5). This trimmed material and the surcharge shall be used in the Embankment in another location on the project. (No Additional Payment)"
It is agreed that the foregoing provision contemplates movement of the surcharge material, after its use as surcharge, and incorporation of the dirt into the project as embankment fill, and further, that the cost of moving the surcharge forward into the embankment was included in the unit price of $1.95 per cubic yard stipulated in the prime contract. In the course of the work, Paving's project manager, Willie Plumlee, concluded that the project could be expedited if the project specifications were altered by utilizing surcharge material as the "select material" which forms part of the base course for the highway, instead of using the surcharge as embankment material.
Base course in this instance consisted of a soil-cement base composed of select material (in this case dirt), cement, water, and other materials mixed together to form the roadbed which was then overlaid with a surfacing of asphalt coating known as hot-mix. Base course in this case was to be paid for at the unit price of $6.00 per cubic yard, mixed and in place on the roadbed, all materials and labor being furnished by the contractor. In effect, Plumlee discovered that the surcharge material met the specifications for select base course material and that the surcharge could therefore be used as a base course component. He suggested that when surcharge dirt was removed after the 90-day test period, it be used as base course material instead of embankment material and pointed out that this change would expedite completion of the project by a significant amount of time. Plumlee obtained verbal approval of the proposed change from the Department's project engineer, *247 Ronnie Luno, and thereafter changed the method of handling surcharge dirt.
The contract [Item 203(5)] pertinently provides the following with respect to payment for special borrow where both select material and special borrow are excavated from the same pit:
"EXCAVATION AND EMBANKMENT: Section 203 of the Standard Specifications is amended as follows....
If the contractor obtains selected materials for base course ... from borrow pits used for special borrow excavation, the volume of materials used in base course ... computed from plan dimensions, plus 15% for shrinkage, will be deducted from borrow pit measurements."
The above provision requires a deduction from borrow pit measurements, in determining payment for special borrow, for the amount of surcharge ultimately incorporated into base course inasmuch as such material was not utilized for embankment purposes as envisioned by the contract. After obtaining Luno's approval of the suggested change in construction sequence, Paving moved surcharge material ahead to other locations on the project and incorporated the material into base course. Paving's claim is for additional work allegedly entailed during the change of work sequence.
Paving contends that its agent, Plumlee, was assured by the Department's project engineer, Luno, that Luno's superiors approved of payment for the movement of surcharge to base course under Item 203(5), "Special Borrow Excavation," at a unit price of $1.95 per cubic yard. Allegedly, Plumlee was informed that a memo to this effect would be placed in the project file. It is conceded that no written order was issued by the Department approving the change. It is also conceded the contract provides that no extra work would be paid for by the Department unless it was approved in writing.
Paving claims reimbursement in the sum of $192,325.25 for moving 65,490 cubic yards of surcharge into base course at $1.95 per cubic yard; reloading surcharge areas to the extent of 21,905 cubic yards at $1.95 per cubic yard; and hauling, moving, and removing the aforementioned 21,905 yards of surcharge at $1.00 per cubic yard.
It is stipulated that a written contract existed between Lambda and the Department and that a written subcontract exists between Lambda and Paving. It is also stipulated that no written contract was entered into between Paving and the Department.
The trial court found that while there was no written modification of the contract, Paving changed the construction sequence in reliance upon verbal agreement with the Department's agents, which agreement appears supplemented by written notations on the plans and by written evidence of such approval placed in the project file in the Department's Baton Rouge office. So finding, the trial court held the Department was equitably estopped from defending the claim on the basis of an absence of a written change order. The court also found that 65,390 yards of material were moved from surcharge to base course for which the Department agreed to pay $1.00 per yard pursuant to Item 203(1) "Unclassified Excavation." The court also rejected Paving's claim of $21,905.00 for hauling, moving, and removing 21,905 cubic yards to rectify a slope failure occurring outside the right-of-way. The trial court disallowed this latter item on finding that plaintiff failed to prove either a written or verbal agreement to pay such a sum. The written authorization or change order authorizing work to repair the failure, makes no mention of a $1.00 per yard payment to remove the dirt. The trial court dismissed Paving's claim against Lambda and also dismissed Lambda's third party demand against the Department.
Relying on Olympia Company, Inc. v. Gervais F. Favrot Co., 342 So.2d 1275 (La. App. 4th Cir. 1977); Chemical Cleaning, Inc. v. Brindell-Bruno, Inc., 186 So.2d 389 (La. App. 4th Cir. 1966); and Pittman Construction Co. v. Housing Authority of New Orleans, 169 So.2d 122 (La.App. 4th Cir. 1964), *248 the Department contends the trial court erred in failing to hold that Paving, a subcontractor having no contractual relationship with the Department, has no right of action against the Department in contract. In relation to this position the Department also invokes La.R.S. 38:2216 and La.R.S. 48:251, which require that highway construction contracts be in writing, and contends that parol evidence is not admissible to vary the terms of a contract required to be in writing.
The Department also contends the trial court erred in finding that Paving moved material beyond the scope of the contract; in applying the doctrine of equitable estoppel; and in awarding Paving any sum whatsoever.
Regarding the doctrine of equitable estoppel, we said the following in Westenberger v. State Department of Education, 333 So.2d 264 (La.App. 1st Cir. 1976):
"Equitable estoppel is the effect of the voluntary conduct of a party which precludes his asserting rights against another who has justifiably relied upon such conduct and changed his position so that he will sustain injury if the former is allowed to repudiate his conduct. Based on good faith, the doctrine prevents injustice by barring a litigant, under special circumstances, from taking a position contrary to his prior acts, admissions, representations, or silence. American Bank and Trust Company v. Trinity Universal Insurance Company [251 La. 445, 205 So.2d 35], above.
"The three elements required for application of equitable estoppel are: (1) a representation by conduct or work [word]; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance. Wilkinson v. Wilkinson, La., 323 So.2d 120."
In the present case, applicable contract documents provide that the project engineer is charged with the onus of insuring performance of the work in accordance with the plans and specifications and, furthermore, that he is authorized to suspend work when the contractor fails to comply therewith. At the time in question Ronnie Luno, since deceased, was project engineer and Bernard Mayeaux was his assistant. Mayeaux was present during the discussion between Luno and Plumlee concerning the change in construction sequence. He confirmed that Luno approved of the change upon learning that the surcharge material met the requirements for select material. He acknowledged hearing Luno telephone Robert Graves at headquarters in Plumlee's presence. According to Mayeaux, Luno then told Plumlee the Department would pay $1.00 per cubic yard to move the surcharge ahead. Mayeaux also observed Luno enter on page 35, part II of the plans and specifications the following notation: "Unclassified Excavation as directed by Bob Graves 4/8/72," which meant that the work was to be paid for under Item 203(1) at $1.00 per cubic yard. According to Mayeaux, some unidentified person subsequently wrote over Luno's notation that the work was to be paid for as "Special Borrow" at $1.95 per cubic yard.
Billy Daniels, former assistant maintenance director (assistant district engineer at time of trial), explained the Department's chain of authority. He noted that a plan change calling for additional payment must be approved by the Chief Engineer or his designate. He also noted that the project engineer possessed authority to interpret the plans and instruct the contractor how to proceed.
Eugene Waguespack was the Department's project engineer for the New Orleans area in 1971. He recognized that the project engineer had authority to approve minor deviations, but no authority to approve additional payment to a contractor. He acknowledged having signed the following letter on behalf of Lawrence Doucet, Assistant Chief Construction Engineer, copies of which were sent to all concerned:
"Dear Sir:
This is to advise that after review of the Plans and Specifications and discussion with the Department personnel and the Federal Highway Administration, the Department will not pay for using the *249 surcharge material in lieu of special borrow on the captioned project.
Our interpretation of the Standard Specifications is that no further compensation is due for moving this surcharge material.
We are of the opinion that morally the contractor may be due additional compensation.
Therefore, if the contractor elects to take the matter to the courts the Department will not contest it.
The Federal Highway Administration has advised that they will abide by any decision of the courts."
Robert Graves, assistant chief construction engineer in 1971, affixed his signature along with that of J. E. Taylor, to the following memo placed in the project file and dated March 7, 1972:
"In conversation with Ronnie Luno, Proj. Engr. it was verbally agreed to pay for removing surcharge and paying for removal under 203(1) `Unclassified Excavation.' Notes to this effect entered on plan sheet # 35 on office copy and proj. engr's copy. Approval of this change by Robert Graves."
Graves testified that the memo reflected and confirmed the results of an earlier discussion between himself, Taylor and Luno. He also stated he was authorized only to make recommendations, not to approve contract deviations.
Lawrence Doucet, the Department's road construction engineer in 1971, testified his then superior was Graves. He stated that Luno, as project engineer, failed to process a plan change form to evidence the plan alteration, as required by normal procedure. However, the consensus of the Department's employees concerned, as expressed in the above quoted communication, was that the contractor was morally due some additional compensation.
William Plumlee, project manager for Paving, admitted the change in sequence was his idea originally and stated that it was adopted by the Department which considered it worthy. He recalled a conversation between himself, Mayeaux and Luno, after Luno had spoken to Graves on the telephone. He testified in effect that if he had not had prior authorization, he would not have changed the sequence and did not do so until he was assured payment would be made and that Luno had made his notation on the plans.
Also in evidence is a written change order form dated October 19, 1973, authorizing payment for additional work to correct a slope failure. Mayeaux testified the work was actually performed in 1972 upon verbal assurance that a written change order would follow. Mayeaux added that Luno similarly authorized Plumlee to move the surcharge involved herein directly into base course and advised Plumlee that a written change order would follow. Paving maintains that it was eventually paid for the work which was verbally authorized to correct the slope failure and that in reliance on Luno's assurance that a change order would be obtained, Paving changed the method of handling surcharge.
Estoppel, being in derogation of normal rights, is applied sparingly by the courts. To rely on equitable estoppel, a party must prove not only that he relied upon a representation or other conduct, but also that he was justified in doing so. American Bank and Trust Co. v. Trinity Universal Insurance Company, 251 La. 445, 205 So.2d 35 (1967). We find that the trial court properly applied estoppel in this instance.
The record establishes beyond doubt that Paving did not vary the construction sequence until verbally assured that it would be paid a specified amount for changing the procedure and until Paving's agent witnessed a notation to that effect made by the Department's employee, Luno, on the contract plans and specifications. It is significant that the notation was made immediately following Graves' approval of the change in a telephone conversation with Luno. That Graves then did not hold the position of assistant chief engineer is of no moment under the circumstances. So far as Plumlee was concerned, Graves was possessed *250 of authority to approve the change. The record also establishes that it was customary between the parties, in matters involving contract changes, for the contractor to proceed on verbal authority upon being assured of approval and upon also being assured the required written authority would follow. In this case, that same procedure was followed with respect to the change order issued in connection with extra work performed to correct the slope failure hereinabove mentioned. In the case of the slope failure, the written approval ensued; in regard to the work sequence change, the promised approval did not materialize. Paving had a right to expect the approval would be granted in writing and relied thereon.
Where an employee, agent or representative is clothed with apparent authority and acts pursuant thereto, his employer is estopped to deny such authority. Rogers v. First Sewerage District of City of Lake Charles, 171 So.2d 820 (La.App. 3d Cir. 1965); New Orleans Fire Fighters Association v. City of New Orleans, 204 So.2d 690 (La.App. 4th Cir. 1967).
We find no merit in the Department's argument that the trial court erred in finding that Paving moved material beyond the contemplation of the contract. Assuming, arguendo, no additional material movement was involved, it remains that the Department agreed to pay additional compensation for the change which benefitted the Department by advancing the contract completion date. See Grossie v. Lafayette Construction Company, Inc., 306 So.2d 453 (La.App. 3d Cir. 1975).
We recognize and adhere to the general rule that a subcontractor having no contractual relationship with an owner has no cause of action in contract against the owner. However, where there are direct dealings between the subcontractor and owner for extra work or a change in work sequence beneficial to the owner, as in this instance, under circumstances giving rise to the doctrine of equitable estoppel, the owner is estopped to deny a contractual relationship with the subcontractor.
The judgment of the trial court is affirmed, all costs to be paid by the Department.
AFFIRMED.