LUTHER E. HALL, Judge pro tern.
Peoples Cotton Oil Co., Ltd., a Louisiana Corporation (hereinafter referred to as “Peoples”) brought suit against Hunt Foods & Industries, Inc. (hereinafter referred to as “Hunt”) on three certain checks issued by Wesson Oil & Snowdrift Inc., a predecessor of Hunt, and on an open account allegedly due by Hunt. Hunt admitted that if it were liable it would owe the sum of $3,514.-19 on the checks and $21,587.55 on the open account, but denied all liability on the ground that it had paid both amounts in full. Judgment was rendered in Hunt’s favor on both claims and Peoples appealed.
The record shows that the three checks sued upon were drawn by Wesson Oil & Snowdrift Inc. to the order of Peoples and delivered to that corporation in payment for certain purchases of cotton oil. These checks were cashed at Peoples’ depositary bank in Lafayette, Louisiana, by one Harry Harwell who was the general manager of Peoples. Part of the proceeds was deposited to Peoples’ account in that bank and part was misappropriated by Harwell. In due course the checks were forwarded to the drawee bank which paid them and debited Hunt’s account therefor.
The record further shows that the amount claimed by Peoples on open account was fully covered by sight drafts drawn on Hunt by Harwell as general manager of Peoples. These drafts were made payable to the order of Peoples’ depositary bank in Lafayette. Harwell obtained cash for the drafts at this bank and deposited part of the proceeds thereof in Peoples’ account at the bank and retained the balance. The drafts were paid by Hunt in due course.
• Appellant contends that payment is not available to Hunt as a defense to suit on the checks since Harwell allegedly was not authorized to endorse the checks. Appellant cites M. Feitel House Wrecking Co. v. Citizens Bank & Trust Co., 159 La. 752, 106 So. 292 and Lawrence J. Kern Inc. v. Panos, *689 La.App., 177 So. 432, 433 as authority for the proposition that since Harwell’s endorsement was unauthorized, it, as payee, may maintain an action against the drawer just as if they had never been negotiated. Appellant further contends that the drafts drawn by Harwell were wholly unauthorized and invalid and that Hunt remains indebted to Peoples on the open account except to the extent of the proceeds of the drafts which were deposited to its account. In this connection it should be said that Peoples prayed for judgment against Hunt only to the extent of the proceeds of the checks and drafts which did not inure to its benefit.
The record discloses that Peoples was engaged in the business of manufacturing and selling cotton seed oil and other products, with principal offices in Lafayette, Louisiana. None of the officers or directors of Peoples resided in Lafayette except Mrs. Inez B. Griffin, an elderly lady who held the title of executive- vice-president and who was a member of the Board of Directors and one. of the largest stockholders. Although Mrs. Griffin held the title of executive vice-president her only authority and function as such was to preside at Board meetings in the absence of the president. Her actual duties were of a very minor clerical nature for which she was paid a salary. She was at the office all day every business day. The other officers and directors of the corporation not only did not reside in Lafayette but had other businesses elsewhere which required practically their entire attention.
In view of these circumstances the Board of Directors entrusted the conduct of the day-to-day business affairs to a general manager, who was neither a member of the Board nor an officer of the corporation. The general manager throughout the perioc. involved in this suit was one Harry Harwell He kept all the books and records of the corporation, opened all the mail, handled all incoming checks, and took care of all the corporation’s banking affairs. He had charge of shipments of cotton oil and otheir products and collected the corporation’s accounts.
The record shows that there was a complete abdication on the part of the Board and the corporate officers of any semblance of supervision over the general manager. At one time when Mrs. Griffin attempted to question Harwell on the conduct of the corporation’s affairs, the other members of the Board objected to her interference and instructed her in no uncertain terms to leave the management of the business to Harwell. In short Harwell ran the corporation as if he owned it.
The only thing which might be said to limit his authority is the fact that in opening a checking account with the bank in Lafayette the corporation filed a signature card with the bank evidencing the necessity of having two signatures on all checks. During the period involved here the two signatures required were those of Harwell and Mrs. Griffin. There is testimony to the effect, however, that instances occurred in which the bank disbursed funds on checks signed by Harwell alone after telephoning him to see if they were in order. The record does not reveal whether or not Mrs. Griffin usually countersigned checks but her testimony is to the effect that Harwell attended to all banking including the cashing of the weekly pay-roll check and that she was entirely ignorant of the corporation’s banking affairs.
Peoples had been doing business with Hunt and its predecessor over a period of years. In fact Hunt was one of its largest buyers of cotton oil. At one period it seems that Hunt made payment for its purchases by check but latterly it became the custom for Peoples to collect its accounts receivable by means of sight drafts (with bills of lading attached) drawn on the debtors in favor of the bank in Lafayette with which the company conducted its business. Harwell drew all of these drafts. The testimony shows that he drew these drafts to the extent of approximately $500,000.00 annual *690 ly — $100,000.00 of this annual amount being drawn on Hunt alone. Over a period of years and not until this suit was filed was any trouble ever experienced by Plunt in thus doing business with Peoples’ general manager, and no suspicion was ever raised in its mind relative to Harwell’s authority to endorse checks or draw drafts.
 Under the above recited circumstances we are of the opinion that Peoples cannot recover in this case. Insofar as Hunt is concerned Harwell had apparent authority to endorse checks and draw drafts. Moreover while the general rule is that implied authority to make and endorse negotiable paper does not arise from the sole fact that an agent has managerial status, an implied authority may arise where it is made to appear that such an agent would be unable to perform all the duties and responsibilities entrusted to him without such authority. And even in cases where the authority may not be thus implied, if a principal has acquiesced in the practice of an agent to make or endorse paper he will be bound by the agent’s act as fully as though he had expressly authorized it. See 2 Am. J. Agency, Sec. 179, page 144.
The officers and members of the Board by abdicating and turning all of the corporation’s affairs over to Harwell without any supervision whatsoever puts the corporation as far as third persons are concerned in the position of having acquiesced in anything that he might do. Moreover, a corporation may lose its right to complain of unauthorized endorsements when, over a period of years there has been no repudiation or protest regarding same. See Ocean Accident & Guarantee Corporation Ltd. v. Denner, 207 Okla. 416, 250 P.2d 217, 37 A.L.R.2d 448.
For the foregoing reasons the judgment appealed from is affirmed.
Affirmed.