298 So.2d 868 (1974)
LOUISIANA BANK AND TRUST CO., CROWLEY, LOUISIANA, Plaintiff-Appellant,
v.
ROANOKE RICE CO-OP, Defendant-Appellee-Third-Party Defendant.
AMERICAN EMPLOYERS INSURANCE CO., Defendant-Appellee-Third-Party Plaintiff,
v.
Thomas L. THOMAS et al., Third-Party Defendants.
No. 4543.
Court of Appeal of Louisiana, Third Circuit.
June 28, 1974.
Rehearings Denied September 4, 1974.
*869 Edwards, Stefanski & Barousse, Homer E. Barousse, Jr., Reggie & Harrington by Oscar W. Boswell II, Crowley, for plaintiff-appellant.
Scofield, Bergstedt & Gerard by John B. Scofield, Lake Charles, Knight & Knight by Herschel N. Knight, Jennings, Deutsch, Kerrigan & Stiles by Marian Mayer Berkett, New Orleans, for defendant-appellee.
Before FRUGÉ, HOOD and DOMENGEAUX, JJ.
FRUGÉ, Judge.
This is an action brought by Louisiana Bank and Trust Company of Crowley, Louisiana, as holder of five warehouse receipts issued by the Roanoke Rice Co-op located in Roanoke, Louisiana. Plaintiff bank appeals from judgment in favor of defendant warehousemen and its surety. We reverse.
Consolidated with the present suit for trial and appeal is a companion case [Security Bank and Trust Company, Wharton, *870 Texas v. Roanoke Rice Co-op and American Employers Insurance Company, 298 So.2d 883 (La.App. 3rd Cir., 1974)] in which plaintiff sued as the holder of one warehouse receipt, also issued by the Roanoke Rice Co-op. We are deciding both cases this date and in this opinion will discuss issues common to the companion appeals.
The pertinent facts are as follows: In the late 1940's Maple Hughes was owner and operator of the Lake Rice Mill located in Lake Arthur, Louisiana, and rice dryer and warehouse facilities at Roanoke, Louisiana. Apparently during this period [because of the fact that a mill cannot issue its own bonded warehouse receipts] Hughes began the practice of issuing warehouse receipts, under the name of the Roanoke facilities, as warehouseman, on rice stored at the Lake Rice Mill. These warehouse receipts were then taken to various banks and pledged as collateral for loans to finance the mills' operations. Hughes sold the Roanoke facilities to the newly incorporated Roanoke Rice Co-op, Inc. in 1950.
After this transaction, Hughes became president of the newly created co-operative, remaining in that position until 1959 when Thomas L. Thomas was elected to the post. In 1951, John P. Hudson, who had previously been an assistant manager under Hughes, became a general manager of the Roanoke Rice Co-op [hereinafter referred to as Roanoke]. Roanoke continued to issue bonded warehouse receipts on rice stored in the Lake Rice Mill facilities by Hughes.
Subsequently, Lake Rice Mill [hereinafter referred to as Lake] and another rice mill facility in Eunice, Louisiana, Rex Rice Co., Inc. [hereinafter referred to as Rex] came under the same ownership and management. Jack R. Smith was the principal stockholder, president, and manager. From time to time Smith also needed financing for his various rice mill operations. In order to obtain collateral for loans which he sought, Smith established the B.H.S. Warehouse Co. in Eunice, also owned by him, for the purpose of issuing warehouse receipts to either Rex or Lake for rice owned or possessed by either at these two facilities. Smith continued the arrangement with John Hudson, the manager of Roanoke's facilities at Roanoke, for Roanoke to act as warehouseman, issuing warehouse receipts in its name for rice stored at the Lake Arthur facility. During this period Lake leased its facilities to Roanoke for $1.00 a year.
Roanoke operated as a non-profit co-operative and became licensed as a warehouseman under the State Regulated Farmer's Warehouse Law (LSA R.S. 54:241-54:260). It complied with the regulations prescribed by the State Warehouse Commission, securing both the requisite license and bond, and qualified to operate a farmer's warehouse issuing warehouse receipts. Roanoke held two State Warehouse Commission Licenses: No. 834A for a field warehouse at Lake Arthur, Louisiana, and License No. 834 for its facilities at Roanoke, Louisiana. Each year both licenses had to be reapplied for and approved. Signature cards were filed with the Warehouse Commission indicating those authorized to issue the warehouse receipts. In addition renewal surety bonds were submitted for both licenses yearly. Originally one bond had been issued for both the Lake Arthur and Roanoke facilities. In 1960 the Warehouse Commission decided that two separate bonds were necessary and Roanoke furnished all the required documents and records.
Hudson apparently handled almost all transactions regarding the Lake Arthur facilities insofar as Roanoke was concerned. This included most of the aforementioned yearly reapplications for licenses and bonds, monthly reports and checks sent to the Warehouse Commission, etc. Several of these documents concerning the facilities at Lake Arthur also required the signatures of other officers of the Co-op.
Hudson was also the co-owner of an insurance agency in Lake Arthur which supplied *871 a group hospitalization policy on employees of Lake and Roanoke. Once a year Lake would invoice Roanoke for its share of premiums, deducting the costs already advanced by Roanoke for State Warehouse Commission fees, bonds, etc. from what Roanoke owed. Therefore, Lake, in effect, paid all costs of the warehouse operation.
Around 1968 Hudson arranged for LeRoy Martin, a bookkeeper employed by Lake, to act as an agent for the convenience of the operations of Roanoke and Lake by affixing his signature to the signature cards sent to the Warehouse Commission thereby allowing him to issue warehouse receipts in the name of Roanoke.
Subsequently, the following warehouse receipts were issued by Roanoke to Rex for rice allegedly contained in the Lake Arthur facilities. These receipts were thereafter pledged as security for the hereinbelow mentioned loans made to Rex by plaintiff, Louisiana Bank and Trust Company.
(1). W.R. #79281 on 900,000 lbs. of clean medium grain rice in good condition, pledged as security for a loan of $72,000 made on December 27, 1968.
(2). (a) W.R. #79285 on 450,000 lbs. of clean long grain rice in good condition, pledged as security for a loan of $62,300 made on February 14, 1969.
(b) [In addition W.R. #73573 on 250,000 lbs. of clean long grain rice in good condition issued by B.H.S. Warehouse was given as collateral for the loan.]
(3). W.R. #79287 on 550,000 lbs. of clean long grain rice in good condition, and
(4). W.R. #79288 on 405,000 lbs. of rough long grain rice in good condition, both pledged as security for a loan of $50,000 made on March 4, 1969.
Note: This note was sold to Security Bank and Trust with the repurchase agreement which was performed on default. Thus Louisiana Bank and Trust regained legal rights thereto.
(5). (a) W.R. #79289 on 150,000 lbs. of clean long grain rice in good condition, pledged as security for a loan of $50,000 on March 10, 1969.
(b) [In addition W.R. #73576 issued on 324,000 lbs. of rough long grain rice in good condition and 200,000 lbs. of milled long grain rice in good condition by B.H.S. Warehouse was given as collateral for the loan.]
Note: W.R. #79286 issued by Roanoke on 486,000 lbs. of rough long grain rice in good condition and W.R. #73574 issued by B.H.S. on 486,000 lbs. of rough long grain rice in good condition were pledged by Rex as security for a loan of $42,720 made on February 18, 1969. The promissory note for said loan had been endorsed over by Louisiana Bank and Trust Company, without recourse, to Security Bank and Trust Company of Wharton, Texas, plaintiff in the companion case. Security is suing on this loan.
All of the above warehouse receipts issued by Roanoke, except for W.R. #79281 were signed by LeRoy Martin. This receipt was signed by John Hudson. It was Martin's testimony that the details as to the type, amount, and condition of rice specified on the receipts was worked out essentially by Jack Smith, with Martin's help.
Louisiana Bank and Trust Company employees testified that, insofar as the loans were concerned, they dealt directly with Jack Smith who had an established line of *872 credit with the bank for almost eight years. They also knew the parties signing the warehouse receipts and that they had extended themselves out as agents of the field warehousemen for years previous thereto. It was admitted that the bank did not inspect the Lake Arthur facility and check each warehouse receipt against what was actually on hand, but that they depended upon the integrity of the borrower. The bank was aware of the range of values on the different kinds of rice at the date of the loan and they merely applied that dollar amount to the number of pounds of specified rice indicated on the receipts. 80% of that value would usually be loaned on the receipts. In addition the bank relied upon the State Warehouse Commission to verify the signatures on the warehouse receipts and had never theretofore received a complaint. The notes were also guaranteed by continuing guarantees signed by the owners of Lake and Rex.
In February, 1969, Louisiana Bank and Trust filed suit against Rex, Lake, and their owners alleging that two large deposited checks, for which credit had been given, had been dishonored and that the two rice mills owed the bank in excess of ½ million dollars. As the financial collapse of the two rice mills seemed eminent, the bank applied for and obtained a writ of attachment on all of the properties of Rex and Lake, including the rice stored at the Lake Arthur facilities on which the aforementioned warehouse receipts were issued. In addition the assets and properties of the owners of said entities were attached. [During this period Rex was also indebted to Security Bank and Trust of Wharton, Texas, for $117,520 (which included the aforementioned $42,720 note, the $50,000 note repurchased by Louisiana Bank and Trust, and the hereinafter mentioned $24,800 loan)].
Louisiana Bank and Trust immediately called in the Louisiana Warehouse Commission. Its representatives made a check to determine whether the rice called for in the warehouse receipts was in the bins at Lake Arthur. The check verified that the rice was indeed all present on March 24, 1969, the day before the seizure. We note, however, that only the amount of rice was estimated (not the kind or quality) and this was done by looking in the bins via flashlight.
Before any action could be taken on the attachment both Lake and Rex were forced into receivership in the state court on March 26, 1969, by their creditors, who were allegedly owed in excess of 2½ million dollars. The receiver took physical control of the facilities. Because the receiver felt (a) that the two entities' assets were worth less than ½ million dollars, (b) that a forced sale would leave many of the creditors at a total loss, and (c) that the rice inventories on hand had to be sold forthwith or they would become spoiled and worthless, he leased the two mills to Farmers Rice Milling Company of Lake Charles for one year. As an adjunct to the lease Farmers agreed to dispose of the rice. The State Warehouse Commission, however, would not allow the rice to be moved until the receiver obtained the warehouse receipts. The receiver then obtained a court order directing the banks to deliver the warehouse receipts to him. The banks were given trust receipts by the receiver.
Before the rice was sold, Louisiana Bank and Trust made application for inspection of the rice at the Lake Arthur facilities to the U. S. Department of Agriculture, Grain Division. Samples were thereafter taken and the rice was inspected and graded. Although the examiners testified that they would not vouch for the actual amount of rice in pounds at the facility, relying for such information on the bin tags or the warehouseman's word, they did find that there was considerable discrepancy between the rice found on hand and that indicated in the warehouse receipts.
The following is a list of what the inspectors found in those bins corresponding to the warehouse receipts pledged as security for loans made by plaintiff-banks.
*873 A. Louisiana Bank and Trust[1]

(1) W.R. #79281 805,000 lbs. of clean medium grain rice
 105,000 lbs. of mixed clean medium and long
 grain rice
 30,000 lbs. of clean long grain rice
 ____________
 940,000 lbs. (40,000 lbs over that specified in
 receipt)
(2) (a) W.R. #79285 220,000 lbs. of clean long grain rice
 120,000 lbs. of clean medium grain rice
 120,000 lbs. of Brewers rice
 25,000 lbs. of rough medium grain rice
 ____________
 485,000 lbs. (35,000 lbs. over that specified in
 receipt)
 (b) W.R. #73573 333,100 lbs. of Brewers rice
 55,000 lbs. of clean mixed rice
 ____________
 388,100 lbs. (138,100 lbs. over that specified in
 receipt)
 Note: 180,000 lbs. of Brewers rice found in Bin 19 includes part rice pledged on
 W.R. #73574.
(3) W.R. #79287 480,000 lbs. of clean medium grain rice
 60,000 lbs. of Brewers rice
 10,000 lbs. of clean long grain rice
 ____________
 550,000 lbs. (exact amount called for in receipt)
(4) W.R. #79288 82,500 lbs. of rough medium grain rice
 95,000 lbs. of rough long grain rice
 ____________
 177,500 lbs. (227,500 lbs. short of that called
 for in receipt)
(5) (a) W.R. #79289 160,000 lbs. of clean medium grain rice
 (10,000 lbs. over that specified
 in receipt)
 (b) W.R. #73576 193,428 lbs. of rough medium grain rice
 62,046 lbs. of rough long grain rice
 122,310 lbs. of rough medium grain rice
 ____________
 377,784 lbs. (146,216 lbs. short of that called
 for in receipt)
 Note: 122,310 lbs. of rough medium grain rice found in Bin 5 includes part rice
 pledged on W.R. #73574.
B. Security Bank and Trust[2]
W.R. #79286 165,000 lbs. of rough medium grain rice
 95,000 lbs, of rough long grain rice
 ____________
 260,000 lbs. (226,000 lbs. short of that called
 for in receipt)
W.R. #73574 197,154 lbs. of rough long grain rice
 176,742 lbs, of rough medium grain rice
 ____________
 373,896 lbs. (112,104 lbs. short of that called
 for in receipt)
Note: The aforementioned 180,000 lbs. of Brewers rice (computed in W.R. #73573) and the
122,310 lbs. of rough medium grain rice (computed in W.R. #73576) were not included
in this computation.

*874 The U. S. Department of Agriculture inspection revealed there was approximately 651,720 lbs. of rice less in the bins than specified in the receipts. In addition there was great discrepancy in the kind of rice found in the bins when compared with the description on the warehouse receipts. Also, much of the rice was below the specified "good" quality in the receipts.
Upon ascertaining that much of the rice could not be sold for its top price in its condition as found, Farmers Rice Milling Company decided, with the approval of the receiver, to upgrade the rice by mixing it with some of its own. Subsequent thereto the rice was eventually sold by Farmers and after expenses and commissions were deducted the proceeds amounting to $265,220.31 were turned over to the receiver.
The sale was accomplished only in connection with a compromise agreement entered into by twenty-nine parties involved in former dealings with Rex and Lake. Under the terms of said agreement on December 22, 1969, Louisiana Bank and Trust and Security Bank and Trust received the total amount from the rice sales. By said agreement the plaintiff-banks also released Rex from all liabilities with the exception of $135,000, plus interest, still owed on a mortgage note due Louisiana Bank and Trust. Both banks, however, clearly reserved all rights under the warehouse receipts to proceed against Roanoke Rice Co-op and its bondsman, American Employers Insurance Company under LSA-R.S. 54:4, as well as against B.H.S. Warehouse Company and its bondsman.
Lake was also released by all parties thereto except Louisiana Bank and Trust and Calcasieu Marine National Bank. In addition, the aforementioned proceedings by Louisiana Bank and Trust against the rice mills and their owners were dismissed, only insofar as Rex was concerned, and all of the parties to the agreement except Louisiana Bank and Trust and Calcasieu Marine National Bank relinquished all civil prosecution claims against the owners of Lake.
Once the rice was sold, the warehouse receipts were cancelled and transferred to the State Warehouse Commission. The plaintiff-banks herein subsequently agreed to divide the proceeds of the rice, with Security Bank and Trust receiving $65,000 as their portion and Louisiana Bank and Trust the remaining $200,220.31. Subsequently, both filed separate suits against Roanoke and its surety for losses of $38,327.97 (Louisiana Bank and Trust) and $8,978.98 (Security Bank and Trust) attributable to the Roanoke warehouse receipts issued on rice stored in the Lake Arthur facility. As aforementioned, these suits were consolidated for trial.
Third party demands were filed by Roanoke's surety, American Employers Insurance Company, against Roanoke, Thomas L. Thomas (President of Roanoke), the heirs of John P. Hudson (former manager of Roanoke), and Mrs. Hudson.
Defendants filed a motion for summary judgment in the trial court alleging that the secondary obligation, or pledge of the warehouse receipts, were extinguished when Rex settled with plaintiff banks in the aforementioned compromise agreement receiving a complete and unconditional release on the primary obligation, or loans. The district judge granted the summary judgment and on appeal to this court reversed at 247 So.2d 632. Therein this court stated:
"This is an erroneous conclusion. The extinguishment by compromise of the debt secured by the warehouse receipts could not have extinguished the obligation represented by the receipts themselves. The obligation to deliver the deposit *875 represented by the warehouse receipts was in no way accessory to the debt which they were pledged to secure. It is a completely separate obligation.
"The debtor here pledged the warehouse receipts as collateral security. Upon his failure to repay the debt the creditor, Louisiana Bank and Trust could by compromise and/or proper legal proceedings, be entitled to ownership of the pledged object. Thus, the rules of suretyship are not applicable here."
The cases were eventually tried on the merits in a trial lasting seven days. The defendants, Roanoke and its surety, asserted multiple defenses including the following:
(a) that Roanoke did not conduct a field warehouse at Lake Arthur,
(b) that the warehouse receipts issued were not negotiable
(c) that plaintiff banks were not holders of the warehouse receipts in question, and finally
(d) that plaintiff banks failed to establish their respective monetary losses.
Each of these defenses was sustained by the trial court and plaintiffs' suits were dismissed.
On this appeal plaintiff banks argue that both Roanoke and American Employers Insurance Company are liable for separate and distinct reasons.
The question of liability of the bondsman, American Employers Insurance Company, depends upon the terms of the bond itself and the provisions of Title 54 of the Louisiana Revised Statutes which require that such a bond be executed and filed.
It is a condition of the bond herein that Roanoke as a warehouseman "shall honestly conduct said business, faithfully perform all duties and obligations to all parties doing business with said Principal as a warehouseman, and shall pay all monies or accounts owed by it ... whatsoever arising out of its conduct of such business of a warehouseman in farm produce..."
LSA-R.S. 54:241-54:260, which prescribes the qualifications of a "State Regulated Farmers' Warehouse", requires each such warehouse to obtain a bond, and "... The bond shall be conditioned on the faithful performance of duties and obligations to the patrons of the warehouse and of the provisions of this Chapter and the regulations prescribed by the commission..." See Western Surety Co. v. Avoyelles Farmers Co-op., 277 So.2d 627 (La.1973).
It is also to be remembered that we are dealing with a bond issued by a compensated surety. It is well settled in our jurisprudence that the obligations set forth in a bond given by a compensated surety are strictly construed in favor of affording protection to the obligee in whose favor it is issued. Prestigiacomo v. Phoenix Insurance Company of Hartford, 231 So.2d 431 (La.App. 4th Cir., 1970) and cases cited therein.
From the language in the bond, as well as the applicable statutory provisions and jurisprudence thereon, we are of the opinion that plaintiff-banks' claims against the surety are valid.
The very purpose of requiring a warehouseman to give a bond is to protect depositors of goods as well as those financial institutions giving credit based upon the negotiable warehouse receipts. The bond is to secure the faithful performance of the warehouseman's duties and obligations and to protect those parties dealing with it who suffer any loss caused by failure to so perform.
The Supreme Court recently stated:
"A warehouse receipt is not an indispensable prerequisite to asserting a claim against a warehouseman on account of his failure to fulfill his obligations to `honestly conduct' the business and to *876 `faithfully perform all duties and obligations to all parties doing business with said ... warehouseman ... arising out of his conduct of such business of a warehouseman in farm produce....' Although State Regulated Farmers' Warehouses are authorized to issue warehouse receipts in accordance with the Warehouse Receipts Act, this authorization is not the exclusive function of these warehouses, nor is it the exclusive basis for liability of the surety under the warehouseman's bond." Western Surety Co. v. Avoyelles Farmers Co-op., supra, 277 So.2d at p. 630.
The evidence presented herein indicates clearly that the goods enumerated in the warehouse receipts and those actually found by the U. S. Department of Agriculture inspection were considerably different as to kind, quality, and quantity. The record also shows that plaintiffs suffered losses as a result of their reliance upon the warehouse receipts representations. As a result, the defendant-surety, American Employers Insurance Company, up to the limits of its bond, is liable to plaintiff-banks for their proven losses.
Defendants on the other hand argue very strongly that, as found by the trial judge, there was in fact no warehouse arrangement at the Lake Arthur facilities and that what actually took place was a "sham". It is pointed out that no corporate authorization by Roanoke was ever issued authorizing any sort of facility at Lake Arthur. Neither did Roanoke have any employees at Lake Arthur, other than Hudson or L. C. Fitzgerald (assistant manager under Hudson) who occasionally visited the premises. Nor was Roanoke paid anything for the service.
Yet it is clear from the record that warehouse commission license # 834A was applied for and granted yearly. Warehouse commission checks for both warehousing facilities were signed by Hudson or Thomas L. Thomas, President of Roanoke, and countersigned by L. C. Fitzgerald or Anthony Hensgens (acting manager for various points in time). Monthly reports for Lake Arthur were prepared and signed by either Hudson or Fitzgerald, and once by a Roland Gary. Yearly continuation surety bond certificates and applications therefor found in the record were signed by Thomas, the President, or Hudson. Signature cards were presented through the years with the signatures of Hudson, Fitzgerald, LeRoy Martin, and Hensgens. In addition the Lake Arthur facilities were leased to Roanoke. It is also very evident to all parties that warehouse receipts on rice at Lake Arthur were in fact issued in the name of Roanoke. Fritzgerald issued a number of receipts in 1966 and 1967 and as aforementioned LeRoy Martin in 1968 performed that function. Hudson also issued receipts intermittently along with Fitzgerald and Martin.
Thus, whether in fact this was a "sham" or a valid warehouse makes no difference as to the liability of the bondsman. Roanoke, according to the records of the State Warehouse Commission, was a warehouseman with facilities at Lake Arthur and as a result could issue warehouse receipts. This, if third parties, such as plaintiffbanks in these suits, are damaged, as indicated herein, this is exactly what the surety bond protects against.
Defendants rely heavily on the holding in Whitney National Bank of New Orleans v. Sandoz, 362 F.2d 605 (5 Cir. 1966). The trial judge also placed great emphasis on this case. However, from a reading of Whitney, as well as the federal district court opinion (226 F.Supp. 872), we find the facts clearly distinguishable from the case at hand. Therein the plaintiff banks were suing as holders of warehouse receipts alleging preference over other creditors and attempting to have the receipts recognized as valid by the court. The federal court, however, held that the warehouse receipts were invalid because the warehousing arrangement in effect was a "sham". The court did not discuss the liability *877 of the warehouseman or its bondsman. The banks herein are not suing on the warehouse receipts to have them recognized. They are suing on the obligation of a warehouseman and its surety because of losses sustained as a result of the receipts not corresponding to rice on hand.
As to Roanoke's alleged liability as a warehouseman we quote from LSA-R.S. 54:20 which provides:
"A warehouseman shall be liable to the holder of a receipt, issued by him or on his behalf by an agent or employee, the scope of whose actual or apparent authority includes the issuing of warehouse receipts, for damages caused by the non-existence of the goods or by the failure of the goods to correspond with the description thereof in the receipt at the time of its issue."
See Orange Rice Milling Company v. Hope Rice Mill, 189 So.2d 64 (La.App. 3rd Cir., 1966) and companion cases.
Defendants allege that Hudson had no corporate authority to issue the warehouse receipts and as a result neither could he have delegated this authority to LeRoy Martin. They allege that their first knowledge of a field warehouse operated in Lake Arthur under their name was in early May, 1969, long after the rice had been seized and sold. At that time Hudson allegedly approached the Board of Directors of Roanoke and revealed what had occurred in the past and that there were large discrepancies in the amount of rice indicated on issued warehouse receipts in relation to what was actually in Lake Arthur. In addition it is argued that Roanoke received no notice whatsoever of the seizure of the facilities nor of the receivership proceedings.
Yet we find in the record that Hudson, while acting as manager of Roanoke, had the general authority to administer and manage the daily affairs of the corporation. Apparently, he was sparingly supervised in his duties and his authority seems to have never been limited by the Board of Directors. Although not given specific authority in the articles of incorporation or by corporate resolution, the evidence is clear that Hudson was in fact authorized to write warehouse receipts on behalf of Roanoke. This was testified to by the President of Roanoke. In fact Hudson acted in this capacity for 16 or 17 years and by acquiescence alone the corporation has impliedly clothed him with the authority to bind it in the operations of its usual course of business. See Friedman v. Noel Estate, Inc., 236 La. 862, 109 So.2d 447 (1959); Wolff v. Caddo-Bossier Safety Council, Inc., 168 So.2d 913 (La.App. 2nd Cir., 1964); Peoples Cotton Oil Co. v. Hunt Foods and Industries, Inc., 147 So.2d 687 (La.App. 4th Cir., 1962); J. Perez, S.A. v. Louisiana Rice Growers, Inc., 139 So.2d 247 (La.App. 3rd Cir., 1962).
By allowing Hudson to do so the corporation also placed him in a situation whereby a person dealing with him was justified in assuming that Hudson was the agent of Roanoke. The law is clear that a corporation is liable for the acts of its officers and agents within the scope of apparent authority conferred on them. Roanoke, the corporation herein, is thus estopped from denying such authority. See Esso Standard Oil Co. v. Welsh, 235 La. 593, 105 So.2d 233 (1958); Skye Realty Co. v. Diversified Ins. Agency, Inc., 221 So.2d 871 (La.App. 3rd Cir., 1969); Harris v. Automatic Enterprises of Louisiana, Inc., 145 So.2d 335 (La.App. 4th Cir., 1962).
Although Thomas L. Thomas, the President of Roanoke, claimed to have not known that a warehouseman facility at Lake Arthur was being conducted in the name of Roanoke, he nevertheless on numerous occasions signed bond applications and Warehouse Commission checks for the Roanoke warehouse at Lake Arthur. In so doing the corporation itself, through its President, created circumstances which led all parties concerned (State Warehouse Commission, plaintiff-banks, etc.) to reasonably *878 believe that Roanoke was performing services at Lake Arthur. See Analab, Inc. v. Bank of South, 271 So.2d 73 (La. App. 4th Cir., 1972).
The remaining issue of the main demand is that of damages. The claims of plaintiff banks are based upon a summary made by George Lewis, a certified public accountant. The alleged losses are computed by Mr. Lewis through comparison of the rice described on the warehouse receipts with the rice found on hand by the U. S. Department of Agriculture in its inspection. Mr. Lewis obtained the estimated value of the rice on hand from Mr. Wayne Robinson, who was employed by the receiver of the corporation, to market the rice for the benefit of the creditors. Mr. Robinson, the Vice President of the Farmer's Rice Mill, testified as an expert in the marketing and milling of rice.
Mr. Robinson estimated the value of the rice based on the USDA inspection certificates which were offered in evidence. The U. S. Department of Agriculture is the accepted standard of the industry in determining the final grade of the commodity. Mr. Robinson's estimate of the sales value of the rice was based upon the kind of rice, its grade, and its milling yield. Mr. Lewis explained his procedure as follows: The estimated value of the rice actually on hand was deducted from the amount loaned on each warehouse receipt.
Defendants assert, however, that the conclusions drawn by Mr. Lewis in attempting to estimate the damages are inaccurate and fail to explain other facts in the record. Specifically, defendants urge that the jackets on the five loans sued upon by Louisiana Bank and Trust Company indicate no balance due as a result of applying other assets which are not explained in the record. Further, defendants claim the compromise which released the Rex Rice Mill, its officers, and stockholders precludes the bank from recovering on the warehouse receipts.
This argument fails to take into account the basis of the obligations sued upon by plaintiff banks. As we stated in our first opinion in this case, 247 So.2d 632, the obligation represented by the warehouse receipts was completely separate from the loan made to the Rex Rice Mill. The warehouse receipts evidence a separate obligation to deliver the deposit represented by them. These warehouse receipts were pledged as collateral security. The debtor failed to repay the debt. Under the compromise, the banks became the owners of the pledged assets. As warehouseman, Roanoke is bound on its obligation to deliver to the depositor or his order on the return of the receipt, the lot properly described in the warehouse receipt. This Roanoke has failed to do. In the absence of the failure to perform its obligation to deliver the deposit, Roanoke or its surety must compensate the depositor or the holder of the receipt.
Defendants assert that the ledger sheets of the banks show no balance due on the loans. The President of Security Bank and Trust and the cashier of Louisiana Bank and Trust, testified that the FDIC Bank Examiners and State Bank Examiners required that the loans made to Rex Rice Company be considered a single debt and consolidated on a single ledger. The bank examiners compelled the banks to apply all assets received to the single debt. The banks were ordered to charge off the remainder of the outstanding indebtedness and reduce the balance on the account to zero. In effect, although the loan was not paid, no balance was indicated on the books of the banks with regard to Rex. Defendants failed to introduce evidence to contradict the methods used by plaintiff banks in this procedure. Defendants do not question the fact that the banks followed the procedure required by the bank examiners.
Defendants also allege that the application of the monies received by plaintiff banks from the sale of the rice, namely *879 $65,000 to Security Bank and $200,220.31 to the Louisiana Bank were improperly applied to the loans. No evidence was introduced by defendants of any misapplication of funds by plaintiff banks. Defendants chose not to offer contradiction of the methods used in apportioning the losses on the basis of the warehouse receipts, nor was any suggestion made as to the procedure undertaken with regard to the receivership.
In view of the totality of the circumstances and the complexity of the situation, the banks together with the receiver did their best to mitigate the losses at a time when the debts of the corporation exceeded some two and one-half million dollars. In a lengthy and detailed compromise agreement executed by the banks, and many of the numerous creditors of the corporation, it is evident that this transaction which involved the actual operation of the debtor corporation's facilities inured to the benefit of defendants in mitigating the losses.
We fully realize the burden of plaintiffs to prove by a preponderance of the evidence the amount of losses which they sustained. The great complexity of the facts and issues of the case have obscured the simple fact that the value of the rice on hand was insufficient to cover the amount loaned on the basis of the description in the receipt. We believe the evidence sufficiently establishes the losses suffered by plaintiffs. The painstaking effort of the accountant in detailing the descrepancies in the rice described in the warehouse receipts with the USDA inspection certificate and the value of the rice is ample evidence of loss.
The computations of Mr. Robinson of the estimated value of the commodity is evidenced by plaintiff's exhibit No. 218 at page 698 of the record. This is a series of accounting schedules which breaks down the warehouse receipts, the USDA inspection certificate number, the bin the rice was contained in, the number of pounds found therein, and the estimated value per barrel. The figures were then totaled to give the estimated value for the commodity attributable to each warehouse receipt. Mr. Lewis's summary is plaintiff's exhibit No. 220, which is again a series of schedules identifying the warehouse receipt, the estimated sales value, the loan made and the calculation of the estimated loss attributable to each receipt.
The estimated loss of plaintiff Louisiana Bank and Trust Company attributable to the Roanoke Warehouse receipts is $38,327.97. The estimated loss of the Security Bank and Trust Company in Wharton, Texas, is $8,979.98. Mr. Robinson testified the actual sales value of the rice was 3% in excess of the estimated value furnished the receiver and plaintiff banks.
This testimony indicates the estimate of the loss should be reduced by 3% to correspond more closely with the loss incurred. We, therefore, find the loss suffered by Louisiana Bank and Trust to be $37,170.13. The loss suffered by Security Bank and Trust is $8,710.58. We believe these sums most nearly approximate the losses incurred by plaintiffs.
Although no answer or appeal was filed by third party plaintiff (American) reserving its rights against third party defendants in the event of an adverse judgment, we think we are required to consider the third party demand. The question of the liability of third party defendants (Roanoke, Thomas L. Thomas, Mrs. Thelma L. Hudson, and the heirs of John P. Hudson) was not decided by the trial court inasmuch as it ruled in favor of defendants. Because of our decision herein, we now reach that question.
The defendant-surety filed a third party action alleging that an indemnity agreement was executed in consideration of and to induce American Employers Insurance Company to issue the bond. By such agreement it is alleged that Roanoke, Thomas L. Thomas, John P. Hudson, and Thelma L. Hudson agreed "to indemnify *880 the Company against all loss, liability, costs, damages, attorney fees, and expenses whatever, which the company may sustain or incur by reason of executing the bond, in making any investigation on account thereof, in prosecuting or defending any action which may be brought in connection therewith in obtaining a release therefrom, and enforcing any of the agreements herein contained". This agreement was signed on behalf of Roanoke by Thomas L. Thomas.
It is apparent from a simple reading of the instrument that the Hudsons signed the application for bond on the lines marked "WITNESSES AS TO" on the left side of the document. This is further corroborated by the testimony of the attorney-in-fact on the bond, Jane Sheppard. Thus it is evident that the Hudsons were not guarantors on the bond and the defendants' third-party demand against them is hereby dismissed.
It is equally clear that Roanoke is bound to indemnify American Employers Insurance Company for any amounts remitted to plaintiffs as a consequence of the present suits. The agreement is express and unambiguous and should be recognized. However, the amount of expenses and attorney fees, provided in the aforesaid indemnity bond contract between American Employers and Roanoke, have not been proved. The right to prove these items is reserved to the parties. See Bag-well v. South Louisiana Electric Co-op Asso., 228 So.2d 555 (La.App. 3rd Cir., 1969), Truxillo v. Gentilly Medical Bldg., Inc., 225 So.2d 488 (La.App. 4th Cir., 1969), Trinity Universal Ins. Co. v. Good, 202 So.2d 379 (La.App. 4th Cir., 1967). Thomas, on the other hand, signed the indemnity agreement on behalf of Roanoke in his capacity as President, not as an individual guarantor or surety. Therefore he is not individually liable on the agreement. See Analab, Inc. v. Bank of South, supra; American Security Bank of Ville Platte, Inc. v. Vidrine, 255 So.2d 140 (La.App. 3rd Cir., 1971).
For the reasons assigned, the judgment appealed is reversed and it is now ordered that there be judgment in favor of plaintiff, Louisiana Bank and Trust Company, Crowley, Louisiana, and against defendant-warehouseman, Roanoke Rice Co-op, and surety, American Employers Insurance Company, in the sum of $37,170.13, together with legal interest[3] thereon from judicial demand until paid.
It is further ordered that there be judgment in favor of defendant, American Employers Insurance Company and against third-party defendant, Roanoke Rice Co-op in the amount of the judgment rendered against American Employers Insurance Company and for all costs. All other rights of either party to and under the bond contract are respectively reserved.
It is further ordered that the third party actions against Thomas L. Thomas, Mrs. Thelma L. Hudson, and the heirs of John P. Hudson be and the same are hereby dismissed.
Costs, both at trial and on appeal, are assessed against defendants-appellees, Roanoke and American Employers Insurance Company.
Reversed and rendered.
DOMENGEAUX, J., concurs in part and dissents in part and assigns written reasons.
DOMENGEAUX, Judge (concurring in part and dissenting in part).
I agree completely and totally with the majority opinion in their holding (a) that plaintiff banks have sustained losses, (b) that the defendant-surety is liable for said losses, although under an indemnity agreement between Roanoke and its surety, the warehouseman is obligated to reimburse American Employers Insurance Co. for *881 those amounts remitted to plaintiffs as a consequence of this suit, and (c) finally that the third party defendants are not liable as guarantors on the surety bond. I do feel however that the evidence presented on the part of the plaintiffs and defendants, as to the amount of losses actually sustained, is insufficient for us to reach a proper conclusion in that regard.
Plaintiff, Louisiana Bank and Trust Company, bases its claim of $38,327.97 against Roanoke and its surety on a summary made by George Lewis, a Certified Public Accountant, which compares the rice indicated on the warehouse receipts issued (both those issued by Roanoke and B.H.S. and pledged to the plaintiff-bank) with that found on hand by the U. S. Department of Agriculture inspection. Lewis then estimates the value of the rice on hand, subtracts this from the amount loaned on each warehouse receipt, and totals the losses. Also accounted for and distinguished are the amounts claimed lost by virtue of B.H.S. warehouse receipts issued. This might seem at first glance sufficient proof of damages were it not for other important facts indicated in the record.
First is the fact that Louisiana Bank and Trust loaned a total of $254,300 on warehouse receipts indicated in the record, [# 79281, 79285, 73573, 79287, 79288, 79289, 73576, 73575] some issued by Roanoke and others by B.H.S. The bank received a total of $200,220.31 from the rice sales, (presumably leaving a $54,079.69 loss sustained on both Roanoke and B.H.S. receipts rather than $73,615.77 as claimed according to the accountant's summary). Thus according to the plaintiff's evidence, the most they should recover is approximately 52% (the percentage of loss attributable to Roanoke's issued receipts as estimated by George Lewis) of $54,079.69 or somewhere around $28,000 plus interest and costs.
In the same context we also find in the record evidence to the effect that Louisiana Bank and Trust did not apply the total $200,220.31 amount received from the rice sales to the loans made on the warehouse receipts. Louisiana Bank and Trust, in answers to interrogatories proposed by the defendant-surety herein, American Employers Ins. Co., indicates it applied the revenues to the warehouse receipts in the following manner:
(a) $20,025 to loan # 5519 (W.R. # 73575) for $20,025
(b) $62,300 to loan # 5373 (W.R. # 79285 and 73573) for $62,300
(c) $44,096.25 to loan # 5572 (W.R. # 79289 and 73576) for $50,000
(d) It applied the remaining $126,421.25 to loan # 47147 ($3,746.56); # 4942 ($21,742.07); and # 5696 ($48,310.43). We have no indication as to what any of these latter loans represent. Therefore we must assume that no money received was applied to loan # 5987 for $50,000 (W.R. # 79287 and 79288) or on loan # 4968 for $72,000 (W.R. # 79281). Yet we find on the note jacket representing loan # 4968 an entry dated December 30, 1969, showing $44,096.25 paid. This is the exact amount, indicated above, alleged to be allocated to loan # 5572.
As pointed out by the majority, there is also the fact that a visual inspection of the note jackets and the bank ledger sheets of the five loans made on the basis of the warehouse receipts indicates that all of them, subsequent to the receipt of the aforementioned $200,220.31 have been marked indicating no balance due as a result of applying other assets (including royalty payments, corporate stock, etc.) of which we have no explanation in the record. Partial reason for such an occurrence may be that the FDIC bank examiners and State Bank Examiners required the "charge off". But the fact remains that according to the note jackets the loans were paid off.
*882 Other factors which the record brings out include the fact that separate agreements, (which we have no record of) other than the compromise, had been executed with Rex and the guarantors on the loans. Jack Smith, manager and part owner of Rex and Lake, claims he paid Louisiana Bank and Trust the sum of $150,000 individually in settlement so as to become discharged from any liability.
As to the claims of Security Bank and Trust Co. of Wharton, Texas, we find similar calculations of the aforementioned accountant to determine an alleged loss of $8,979.98 sustained as a result of the issuance of the warehouse receipts.
However, in the record we find that Security Bank and Trust loaned a total of $67,520 on warehouse receipts # 79286 (Roanoke) and # 73574, 73575 (B.H.S.). They received $65,000 from the rice sales (presumably leaving a $2,520 loss sustained on both Roanoke and B.H.S. issued receipts rather than $24,976.99 as shown in the accountant's summary). Thus the most they should recover is approximately 32% (the percentage of loss attributable to Roanoke issued receipts as estimated by George Lewis) of $2,520 or somewhere around $800 plus interest and costs.
Testimony is to the effect however that Security applied the $65,000 to the entire initial debt of $117,520 mentioned in the majority opinion, $50,000 of which was the note issued on WR # 79288 which was repurchased by Security Bank and Trust according to agreement.
The majority disposes of these arguments by stating that the warehouse receipts evidence a separate obligation from the loans made, id est, the former being to deliver the deposit represented by them. It may be that the obligation on the warehouse receipts is separate from that of the loans but the plaintiffs still must show what their losses are in order to recover. As aforementioned, I think they have failed to do this. As pointed out by the majority, the Supreme Court in Western Surety Co. v. Avoyelles Farmers Co-op, 277 So.2d 627 (La.1973) stated that "a warehouse receipt is not an indispensable prerequisite to asserting a claim against a warehouseman" and such is not "the exclusive basis for liability of the surety under the warehouseman's bond". The claim herein is against the defendant-warehouseman "on account of his failure to fulfill his obligations to `honestly conduct' the business and to `faithfully perform all duties and obligations to all parties doing business with said ... warehouseman... arising out of his conduct of such business of a warehouseman in farm produce ...'" In addition a warehouseman (and its surety) are liable "for damages caused by the non-existence of the goods or by failure of the goods to correspond with the description thereof in the receipt at the time of its issue." LSA R.S. 54:20. What then were the losses or "damages" incurred herein by plaintiff-banks? It seems to me that they are the sums loaned on the warehouse receipts minus the total amounts received (from whatever source) and accounted against said loans.
From the foregoing I am of the opinion that those amounts alleged to be lost by the plaintiff-banks do not correspond to damages actually sustained. I have raised many questions which in my mind have to be answered before the banks' losses can be accurately determined. I fully realize the great complexity of not only the facts of this case, but also the elements of proof needed. Therefore, I feel the interests of justice so dictate that under the circumstances plaintiff-banks should be given an opportunity to show the extent of damages suffered. As a result, in an exercise of our discretion, I would remand these cases to the district court for further proof on the question of losses. LSA C.C.P. 2082, 2164, Hebert v. Travelers Indemnity Co., 255 La. 645, 232 So.2d 463 (1970); Spriggins v. Broadmoor Esso Service Center, 263 So.2d 365 (La.App. 4th Cir. 1972); *883 Hamilton v. Hamilton, 258 So.2d 661 (La. App. 3rd Cir. 1972); Turpin v. Turpin, 175 So.2d 357 (La.App. 2nd Cir. 1965); Rizzuto v. Employers Liability Assurance Corp., 152 So.2d 857 (La.App. 4th Cir. 1963); Camus v. Bienvenue, 91 So.2d 99 (La.App. 1st Cir. 1956).
I respectfully concur in part and dissent in part.
NOTES
[1] In addition to the aforementioned loans Louisiana Bank and Trust had made another loan to Rex in the amount of $20,025 with W.R. #73575 issued by B.H.S. Warehouse Co. allegedly on 250,000 lbs. of clean long grain rice stored at Lake Arthur as security. The U. S. Department of Agriculture found inof clean medium grain rice, 41,100 lbs. of clean long grain rice, and 11,500 lbs. of mixed, stead 128,100 lbs. of Brewers rice, 27,800 lbs. i. e. 41,500 lbs. less than called for.
[2] Security Bank and Trust had also made an additional loan to Rex in the amount of $24,800 with W.R. #73572 issued by B.H.S. Warehouse Co. allegedly on 400,000 lbs. of clean rice stored at Lake Arthur as security. The U. S. Department of Agriculture found instead 133,500 lbs. of broken rice, 80,000 lbs. of mixed rice, and 65,000 lbs. of Brewers rice, i. e. 121,500 lbs. less than called for.
[3] Legal interest shall be at the rate of 5% since suit was filed prior to Act 315 of 1970.